UNITED STATES of America, Appellee,

v.

Donato BATTISTA, Appellant.

No. 88–3125.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 28, 1989.

Decided June 2, 1989.

---

Marvin D. Miller, Alexandria, Va., for appellant.

Erik Christian, with whom Jay B. Stephens, U.S. Atty., Michael W. Farrell, Helen M. Bollwerk, and Judith E. Retchin, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before WALD, Chief Judge, and ROBINSON and BUCKLEY, Circuit Judges.

Opinion for the Court filed by Chief Judge WALD.

WALD, Chief Judge:

Donato Battista appeals his conviction for possession of cocaine with intent to distribute, arguing that the district court erroneously failed to suppress evidence that was obtained in violation of the fourth amendment. The district court found that although the search that revealed the evidence was conducted without a warrant, it was nevertheless lawful, on two separate theories: first, the court concluded that the officers had probable cause and were confronted with exigent circumstances; second, the court found that the entire search was authorized by Battista's voluntary consent. Because the record amply reflects the correctness of the latter ground, we find no error in the district court's decision to admit the evidence at Battista's trial.[1] Battista's conviction is accordingly affirmed.

## I. BACKGROUND

The relevant factual background was set out in the uncontradicted testimony of William Pearson, an officer in the drug enforcement unit of the Amtrak police department, at the suppression hearing held prior to Battista's trial. Pearson testified that Battista made a one-way Amtrak reservation on December 8, 1987, for Train 98 leaving the following day from Fort Lauderdale, Florida, and travelling to Newark, New Jersey. His reservation was for a sleeping compartment, or "roomette." At the time he made his reservation, Battista gave the ticket agent a "call-back" number —a telephone number at which he presumably could be reached prior to departure. On the morning of December 9, Battista appeared at the Fort Lauderdale train station and paid for his ticket with cash approximately 40 minutes prior to the train's scheduled departure time.

While Train 98 was en route from south Florida, Battista's presence on the train did not go unnoticed. Certain of the facts just recounted—notably, that Battista paid *cash* just prior to departure for *one-way travel* from a so-called *"source city"* for illicit drugs to the Northeast—first drew Officer Pearson's attention to Battista, for these

---

1. Since we find that the search was justified by Battista's consent, it is not necessary for us to address the issues of probable cause and exigent circumstances. Moreover, our finding that Battista voluntarily authorized the search of his suitcase obviates the need to discuss whether the law enforcement officers had a duty to seize the bag and obtain a warrant. *Compare United States v. Tartaglia,* 864 F.2d 837, 843 (D.C.Cir. 1989) (finding on facts similar to these that such a duty does not arise).

evidently are factors that he has come to associate with possible drug courier activity. Pearson's suspicion was heightened when he called the telephone number given by Battista and it was out of service.[2] Pearson decided to "attempt to interview" Battista when the train made its scheduled 25–minute stopover at Union Station in Washington, D.C. *See* Suppression Hearing Transcript ("Tr.") at 16. In preparation for this interview, Pearson testified that he contacted Special Agent John Robinson of the Drug Enforcement Administration's ("DEA") Mass Transportation Group, to request his assistance the following day. During this conversation, Pearson asked Robinson if the latter would make a "drug dog" available. Tr. at 17.

The following morning, when Train 98 arrived at Union Station, Pearson was accompanied by DEA Special Agents Robinson and Bill Dionne, and Detective Sam Grey of the Virginia state police to greet it. According to Pearson's testimony, Detective Grey "had a drug dog with him...." Tr. at 17. The officers boarded the train car on which Battista was supposed to be present. The "drug dog" (whose qualifications have been challenged in this appeal) was taken down the corridor of the car, and it "alerted" at the door of Battista's roomette (number 11), "indicating the presence of a controlled substance." Tr. at 19. At that time, Detective Grey and the dog left the train and waited on the platform.

Pearson and Robinson knocked on the door of roomette 11. When Battista opened the door, Officer Pearson, who was in plainclothes and whose gun was not visible, displayed his badge and identified himself, saying, "I would like to talk to you for a minute." Tr. at 19. According to Pearson, Battista responded, "Sure," closed the door, and then opened the door again. Pearson asked Battista for identification, and Battista produced a New Jersey driver's license. He stated that he had driven from New Jersey to Florida with a friend.

Pearson then informed Battista that a "trained drug detection dog" had given an alert on his compartment, indicating the presence of a controlled substance. Tr. at 21. "Based on the alert by the drug detection dog," Pearson continued, "I would like your permission to search your room and that suitbag," pointing to a suitbag on a luggage rack visible from where he was standing. Tr. at 21. Battista responded, "Sure." When told that he did not have to allow a search, he said, "That's okay," and then took the suitbag down from the rack and placed it out in the hallway. Tr. at 21. The search of the suitbag revealed nothing but an airplane ticket for one-way travel from Newark to Fort Lauderdale on December 8. Battista changed his original story, indicating without explanation that he had in fact flown—not driven—to Fort Lauderdale. Tr. at 22.

Pearson asked Battista to step outside the compartment. Pearson then conducted a search of the roomette, discovering under the bed a suitcase with a combination lock. When he asked Battista if he knew the combination to the lock, Battista "indicated that he did, came inside of the compartment, manipulated the numbers on the combination, and unlocked it." Tr. at 22. Inside the suitcase, Pearson discovered a plastic bag that was wrapped inside a pair of blue jeans. The bag itself contained two smaller packages which, upon penetration with the nail-file component of a pocketknife, were discovered to contain a white powder that later field tested positive for cocaine. Battista was placed under arrest and was taken to the Amtrak police office. This prosecution ensued.

The district court ruled that the evidence seized by the officers on the train was admissible against Battista. First, the court found that the officers had probable cause to search the room,[3] and that given

---

2. In fact, when Officer Pearson dialed the number, he got a recording informing him that he had reached a number that had been changed to an unpublished number. Officer Pearson subsequently testified that he learned from the lo-

cal sheriff's office in Florida that the new number was not listed to anyone named "Battista."

3. The district court's opinion states, apparently inadvertently, that once the police officers were alerted to the presence of controlled substances in Battista's compartment, "they had probable

the exigent circumstances present in this case—notably, the fact that Battista's train was scheduled to remain at Union Station for only 25 minutes—the officers were justified in searching the compartment without a warrant. *See United States v. Battista,* Crim. No. 88–1, mem. and order (D.D.C. May 2, 1988), at 3. Alternatively, the court concluded that the search could be upheld "on the basis of defendant's consent to the presence of the officers in the roomette, and their search of the suitcase." *Id.* at 3 n. 1. Following a bench trial, the district court found Battista guilty of possession with intent to distribute in excess of 500 grams of cocaine, pursuant to 21 U.S.C. §§ 841(a) and 841(b)(1)(B)(ii), and possession of cocaine, pursuant to 21 U.S. C. § 844(a).

## II. ANALYSIS

The fourth amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." In determining whether the search at issue violated the precepts of the fourth amendment, this court faces a two-part inquiry. First, we must inquire whether the initial contact between Battista and the officers was justified. Next, we must determine whether the ensuing search conducted by the officers was within the scope of their authority —in this case, whether Battista voluntarily consented to a search, and if so whether the search that was conducted stayed within the scope of the consent given.

### A. *The "Interview"*

As a preliminary matter, we must determine whether the encounter between the law enforcement officers and Battista amounted to a detention that requires fourth amendment protections. The relevant test for assessing whether a "seizure"

has occurred focuses on "whether a reasonable person would conclude from the circumstances, and the show of authority, that he was not free to leave the officer's presence." *United States v. Brady,* 842 F.2d 1313, 1314 (D.C.Cir.1988) (citing *Gomez v. Turner,* 672 F.2d 134, 141 (D.C.Cir. 1982)). In evaluating claims of seizure, the *Brady* court pointed to several factors typically found to induce persons to think that they have no choice but to remain present for an "interview" such as the one at issue here, including displayed weapons, physical intimidation, or threats—factors that were not present in this case. 842 F.2d at 1314. The court went on, however, to acknowledge that other less plainly coercive factors, such as "unusual setting or time," *id.,* can nevertheless create an environment in which a reasonable person would feel that he had no practical choice but to stay.

■ In reviewing the facts of this case, we believe that the convergence of several subtle factors would cause a reasonable person to conclude that he was not free to leave the officers' presence, and that the officers did in fact effect a "seizure" as that term is understood under fourth amendment jurisprudence when they conducted their "interview" with Battista. The officers apparently roused Battista from his bed at 6:30 a.m., causing him to answer their knock on the door of his roomette in some partial state of undress. A reasonable person, roused early in the morning while wearing only his underwear in a city that is neither home nor ultimate destination might rightly doubt what he could do if he did *not* wish to remain in the officers' presence. His only conceivable retreat would be to close the door on the officers and remain in the roomette—but we have recently held that there is no heightened expectation of privacy in a train roomette, *see Tartaglia,* 864 F.2d at 841, and thus it would be small solace to direct our reasonable person back inside if what

---

cause to *arrest him. United States v. Fulero,* 498 F.2d 748 (D.C.Cir.1974)." *United States v. Battista,* Crim. No. 88–1, mem. and order (D.D.C. May 2, 1988), at 3 (emphasis added). In context, however, it is clear that the officers had only probable cause to *search* the compartment.

That this is what the district court in fact concluded is confirmed by reference to the cited authority, which deals exclusively with the issue whether a dog sniff gave rise to probable cause for the search of a suitcase.

he wishes is simply to be left alone. And while the unique facts of this scenario may not be enough to render the contact a seizure at its inception, it surely became one after Battista was asked for his identification and upon perusal the identification was not returned. It is well established that the mere request for identification does not inevitably give rise to a seizure, *see Gomez v. Turner*, 672 F.2d 134, 142–44 (D.C.Cir. 1982). But once the identification is handed over to police and they have had a reasonable opportunity to review it, if the identification is not returned to the detainee we find it difficult to imagine that any reasonable person would feel free to leave without it. There is no evidence in the record suggesting that Battista's papers were returned to him (and we therefore assume that they were not), so to the extent a reasonable person would have felt free to leave the officers' presence prior to the request for his papers, this freedom evaporated for the duration of the exchange following the request. *Cf. Florida v. Royer*, 460 U.S. 491, 501, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983) (plurality opinion) (noting that a seizure occurred when, among other things, police "retain[ed] [the suspect's] ticket and driver's license ... without indicating in any way that he was free to depart ..."). Although none of these factors taken individually is necessarily determinative, due regard for the totality of the circumstances leads us to conclude that the "interview" with Battista constituted a "seizure."

■ We hasten to add, however, that the seizure at issue in this case was not an "arrest," which would require a showing of probable cause. Rather, the contact between Battista and the officers took the form of what has previously been called an investigative stop. The Supreme Court recently explained, relying on the doctrine first announced in *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968), that "the police can stop and briefly detain a person for investigative purposes if the officer has a *reasonable suspicion* supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, — U.S. —, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (emphasis added). In *Terry*, the Court noted that the officer must be able to show that he or she had more than an "inchoate and unparticularized suspicion or 'hunch.' " 392 U.S. at 27, 88 S.Ct. at 1883. "In evaluating the validity of a stop such as this, we must consider 'the totality of the circumstances—the whole picture.' " *Sokolow*, 109 S.Ct. at 1585 (quoting *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981)). The facts in this case demonstrate that the officers clearly had such reasonable suspicion to approach Battista.

First, in *Sokolow* the Supreme Court found that officers had reasonable suspicion to detain a traveler in an airport on the basis of certain characteristics that were consistent, in the view of the trained officers, with drug trafficking behavior. In that case,

the agents knew, *inter alia*, that (1) [the defendant] paid $2,100 for two airplane tickets from a roll of $20 bills; (2) he traveled under a name that did not match the name under which his telephone number was listed; (3) his original destination was Miami, a source city for illicit drugs; (4) he stayed in Miami for only 48 hours, even though a round-trip flight from Honolulu to Miami takes 20 hours; (5) he appeared nervous during his trip; and (6) he checked none of his luggage.

109 S.Ct. at 1583. The Court engaged in what is inevitably a fact-specific inquiry and determined that the enumerated factors did give the officers sufficiently reasonable suspicion to detain the defendant. In the present case, the factors known to Pearson were not as suspect as those present in *Sokolow*: although Battista paid for his ticket in cash, there is no evidence that this mode of payment was as conspicuous as the peeling off of more than $2,000 from a wad of $20s; moreover, there is no evidence that Battista looked peculiarly nervous or otherwise displayed suspicious demeanor during any part of his trip, and we have no information regarding Battista's clothes or luggage. Neverthe-

less, it cannot be gainsaid that the information known to Pearson prior to the morning of December 9 at least formed a reasonable basis for further inquiry.

If there were no more grounds for an investigative detention of Battista beyond this limited information, we might be reluctant to find that the detention was justified. But Pearson's inquiry went much further before he actually approached Battista in his compartment. Pearson arranged with a DEA officer to have a "drug dog" present to conduct a sniff of the train car. The following morning, Detective Grey arrived with "Gabe," which Pearson evidently believed to be a "trained drug detection dog," and the dog alerted at Battista's door.[4] Regardless of whether the testimony at the suppression hearing pertaining to Grey and Gabe would have satisfied a probable cause inquiry,[5] which requires the court itself to conclude that probable cause exists to believe that a crime is being or is about to be committed, there can be no serious dispute that Pearson's testimony fully supports his reasonable suspicion to approach Battista. It was reasonable for Pearson, having asked a DEA official to provide a trained dog, to rely on the dog that was present the next morning at Union Station. Any other holding would implicitly require officers in the field to make background and reliability checks on drug dogs—indeed, on *all*

sou. ⌐s of information—in the field before forming and acting on their "reasonable suspicions." But it was the need to get away from such overly formalized procedures that created the impetus for the reasonable suspicion standard in the first place. *See Terry*, 392 U.S. at 20, 88 S.Ct. at 1879 (focusing on "necessarily swift action predicated upon the on-the-spot observations of the officer on the beat"). Once the dog alerted at Battista's door, the officers had reasonable suspicion to make an investigative detention.[6]

### B. *The Search*

Having determined that the officers effected an investigatory detention when they confronted Battista, we must still ascertain whether the consent given by Battista while he was being detained validly authorized the search that the officers proceeded to conduct. The mere fact that Battista was temporarily "seized" for fourth amendment purposes does not undermine his ability voluntarily to consent to a search. *See Florida v. Royer*, 460 U.S. 491, 502, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983) (plurality opinion) ("[H]ad Royer voluntarily consented to the search of his luggage while he was justifiably being detained on reasonable suspicion, the products of the search would be admissible against him.").[7] Although the district

---

4. Battista does not challenge, and therefore we do not address, the use of a drug dog to conduct a sniff in circumstances such as these.

5. Battista argues that there is no evidence in the record to show "that this dog had been trained or qualified to detect anything." Br. for Appellant at 12. *Compare United States v. Spetz*, 721 F.2d 1457, 1464 (9th Cir.1983) ("A validly conducted dog sniff can supply the probable cause necessary for issuing a search warrant only if sufficient reliability is established by the application for the warrant."). We do not address this challenge, because only the issue of reasonable suspicion—not probable cause—is before us.

6. Indeed, were it not for the dispute over the qualifications of the drug dog, the facts of this case would in all relevant respects be identical to the facts outlined in *Tartaglia*, 864 F.2d 837 (D.C.Cir.1989), in which this court found that the officers had *probable cause* to conduct a search of a train compartment.

7. Battista relies on the plurality opinion in *Royer* for the proposition that "[o]nce an individual is seized without sufficient legal justification, any consent which follows is involuntary." Br. for Appellant at 15. This contention loses all force in this case, because we have determined that the limited seizure of Battista was fully supported by legal justification. Moreover, the seizure in this case was not so infected with the show of police authority that no consent would be possible. *Cf. United States v. Watson*, 423 U.S. 411, 424, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976) ("[T]he fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search."). Rather, the finding of a seizure in this case flows from the combination of the minimal show of police authority with the peculiar time and setting of the encounter and the retention of the suspect's identification. These factors must be refocused and analyzed anew to answer the qualitatively different question whether a reasonable person who did not feel free to leave would nonetheless

court did not expressly address the seizure question, it did find voluntary consent to search. This ruling, grounded as it is in factual findings, may be reversed only upon a determination that it was clearly erroneous. *See United States v. Lloyd,* 868 F.2d 447, 451 (D.C.Cir.1989). We conclude that the district court did not err on this point.

■ This court has recently reiterated the test for assessing the voluntariness of a consent to search:

To determine whether consent is voluntary, a court must apply a "totality of all the surrounding circumstances" test, considering factors such as the accused's age, poor education or low intelligence, lack of advice concerning his constitutional rights, the length of any detention before consent was given, the repeated and prolonged nature of the questioning, and the use of physical punishment.

*Lloyd,* 868 F.2d at 451 (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973)). Battista does not point to any of these factors as indicating a lack of voluntariness on his part, and we do not find any of them to be particularly applicable in this case. Rather, by all accounts the encounter was marked by its civil, conversational tone, and the cooperative attitude of Battista. Indeed, after Battista first consented to a search of his room and suitbag, he was informed by the officers that he did not have to consent to such a search, but he responded, "That's okay." While the law does not require officers to give suspects such a warning,[8] its presence can be probative of the voluntariness of consent. The evidence in this case simply does not support a finding that Battista's will was in any way overborne. Rather, the available testimony fully supports the district court's finding of voluntariness.

Moreover, the search that the officers conducted stayed within the scope of the consent granted. As was noted in *Walter v. United States,* 447 U.S. 649, 656, 100 S.Ct. 2395, 2401, 65 L.Ed.2d 410 (1980) (opinion of Stevens, J.), "When an official search is properly authorized—whether by consent or by the issuance of a valid warrant—the scope of the search is limited by the terms of its authorization." Battista makes two arguments in this regard. First, he contends that he was never asked permission, and hence could never give it, to search the suitcase that was found to contain the cocaine. The record, however, will not support this line of argument, for it appears clear to us that under any reasonable reading of the events related by Officer Pearson, he had authority to search the suitcase: the record plainly shows that he was authorized by Battista to search the room in the first instance by express consent, and when he discovered the second locked suitcase under the bed, his question to Battista—namely, whether Battista knew the combination—and Battista's response—*i.e,* to enter the roomette and open the bag for him—clearly and unambiguously signalled Battista's further express consent to a search of the suitcase. *Cf. United States v. Griffin,* 530 F.2d 739, 742 (7th Cir.1976) (consent may be in the form of words, gesture, or conduct).

■ Battista's second contention regarding the scope of his consent relates to whether Pearson, once inside the suitcase, needed further consent to probe the plastic packages he discovered therein. In effect, Battista would turn the search of this bag into a game of "Mother-may-I," in which Pearson would have to ask for new permission to remove each article from the suitcase to see what lay underneath. We decline to impose such an unrealistic restriction on an officer's ability to make a search that is reasonably targeted, within the confines of his authority—here, consent to search the suitcase—to uncover the object of the search. Early on in the encounter, Battista was informed that he was suspected of carrying illegal drugs. When he voluntarily opened his suitcase and consented to its search, he did not authorize a search in the abstract. Rather, he authorized a

---

feel comfortable declining to authorize a search of his roomette and luggage.

**8.** *See Schneckloth v. Bustamonte,* 412 U.S. 218, 231–33, 93 S.Ct. 2041, 2050, 36 L.Ed.2d 854 (1973).

search *for drugs.* Pearson was therefore justified in probing the contents of the suitcase, within reasonable limits, as was necessary to uncover this particular contraband. *See United States v. Dyer,* 784 F.2d 812 (7th Cir.1986) ("The consent to search luggage validates the search both of the luggage and of containers within the luggage."); *see also* LaFave, Search and Seizure § 8.1(c) (1987) ("Ordinarily, it would appear that [a general consent permits the opening of closed but unlocked containers found in the place as to which consent was given], particularly if the police have indicated they are searching for a small object which might be concealed in such a container.").

## III. CONCLUSION

In view of the foregoing, we conclude that Battista's consent to the search of his compartment and his luggage fully justified the officers' search. We therefore affirm the district court's ruling and sustain the conviction.