**UNITED STATES of America**

v.

**Mark V. LEVETAN, Defendant.**

Crim. No. 89–0403.

United States District Court,
District of Columbia.

Jan. 3, 1990.

James G. Cowles, Jr., Asst. U.S. Atty., Washington, D.C., for plaintiff.

William J. Garber, Washington, D.C., for defendant.

## MEMORANDUM OPINION

FLANNERY, District Judge.

On October 1, 1989, police boarded an Amtrak passenger train while it was stopped at Union Station in Washington, D.C. Two officers went to passenger Mark Levetan's room, spoke with him, and without a warrant searched his luggage. The police arrested Levetan after finding illegal heroin in his luggage. Arguing that the search was unlawful, Levetan now moves the court for an order barring the prosecution from using the heroin as evidence against him when he is tried for the crime of possessing heroin that he intended to distribute.[1] The government opposes the motion to suppress. The court held an evidentiary hearing on the motion November 30, 1989, and now will grant it as stated below.

### I.

Three witnesses testified at the hearing: Sgt. John J. Brennan of the Washington, D.C., Metropolitan Police Department (MPD), the defendant Mark Levetan, and the defendant's mother, Mrs. Patricia Anne

---

**1.** The grand jury indicted Levetan for possession of a detectable amount of heroin with intent to distribute it in violation of 21 U.S.C. § 841(a)(1) and § 841(c).

O'Dere Levetan. The only evidence marked or introduced was a picture of Levetan's luggage.

Brennan and the defendant both recounted the events leading to Levetan's arrest. Brennan has 18 years on the force. He has headed MPD's Narcotics Interdiction Unit since 1987.[2] In that time, he has taken part in 30–40 interviews with train passengers suspected of couriering drugs. A dozen of these took place when the traveller had reserved a sleeping compartment or "roomette." Taking together his statements on direct and cross-examination, Brennan testified to the following events.

The sergeant worked with Amtrak police agent Calvin Burns on the day the defendant was arrested. Burns told Brennan that a Mark Levetan was travelling from New York City to Atlanta on Amtrak Train No. 19 and that Levetan had paid cash for a round-trip ticket. According to Brennan, when Burns phoned the call-back number Levetan had given Amtrak, he learned that the phone number was Levetan's, but the woman who answered the phone did not know where he was.

Based upon this, Brennan and Burns boarded Train No. 19 during a short stopover at Union Station at about 6:00 p.m. and went to the "roomette" that Levetan had taken for the trip. Both officers were in casual clothes. Brennan testified that he knocked on the door and Levetan asked who was there. Brennan answered "Amtrak." Levetan then opened the door, and Brennan said he was a police officer and showed Levetan an identification folder. Brennan testified that the room was about six feet long and three feet wide. In this cramped, confined space were toilet facilities, Levetan's luggage, and a fold-down bed. Brennan said he asked if he could talk to Levetan, who agreed to this. The sergeant asked to see Levetan's train ticket and some type of identification. Levetan gave these to Brennan. Both were in Levetan's name. The sergeant asked Levetan how long he had been in New York, and the defendant answered a couple of days. This squared with what the officers had learned earlier. Although Levetan appeared calm when he first answered the door, Brennan said the defendant then became "tremendously nervous. He kept turning around in the compartment. He turned his back on me, reaching around, and with beads of sweat on his head." Transcript of Testimony of Sergeant John J. Brennan and Defendant Mark V. Levetan ("Tr.") at 7.

According to the sergeant, Levetan then asked, "what is this all about, and I advised him that I was with the Police Department, Narcotics Branch, and we talked to people in an attempt to stop the flow of narcotics." *Id.*

Next, Brennan said he asked Levetan if he had any narcotics in the roomette, and Levetan told him no. The sergeant then asked Levetan "if I could search his compartment and his suitcases, and he said, 'Yes.'" *Id.* Brennan testified that he

---

**2.** Among other things, members of the unit try to identify inter-city bus and train passengers whose actions suggest they might be carrying illegal drugs. The officers do so by collecting information about such things as (1) whether the passenger pays for the ticket in cash, (2) where the traveller starts and ends the journey and whether these places are considered "source" or "use" cities for illegal drugs, (3) whether the passenger buys one-way or round-trip tickets, (4) what kind of name the traveller gives when buying a ticket or making reservations, (5) how long before the bus or train leaves the passenger buys a ticket, (6) whether the telephone number for the reservation agent to call back is a working number at a place where the passenger is known, (7) whether a round-trip train passenger has taken different accommodations on each leg of the trip, such as a first class room or sleeping compartment going and a coach seat returning, and (8) whether the reservation is made in one name and the ticket bought in another. If some combination of the answers to these questions hints at drug trafficking, the officers try to meet and talk with the targeted passengers at transport terminals, such as Union Station, or the Greyhound and Trailways bus depots. Such interviews aim at confirming or dispelling the officers' suspicions. See, e.g., *United States v. Savage*, 889 F.2d 1113, (D.C.Cir.1989); *United States v. Baskin*, 886 F.2d 383, 385 (D.C.Cir.1989); *United States v. Colyer*, 878 F.2d 469, 471 (D.C.Cir.1989); *United States v. Carrasquillo*, 877 F.2d 73, 74–75 (D.C.Cir. 1989); *United States v. Battista*, 876 F.2d 201, 203 (D.C.Cir.1989); *United States v. Tartaglia*, 864 F.2d 837, 839 (D.C.Cir.1989).

searched a brown suitcase standing on the floor and found nothing illegal in it. Brennan said he then spotted a second suitcase on a rack above his head and asked Levetan if he could search that bag. According to Brennan, Levetan said he could. Brennan took down the suitcase. It seemed to be locked and Brennan asked Levetan if it was. The sergeant testified that when Levetan told him the bag was locked, Brennan asked, " 'Could you open it?' And he started to, and he said, 'Is this necessary?' And I said, 'I can only do this with your permission.' And he opened the suitcase." Tr. at 9. Inside the second suitcase, Brennan found a grey pouch, which he took out and set down next to Burns. According to Brennan, Burns had been standing in the doorway, partly in the roomette and partly in the hallway. The grey pouch was zippered shut. Brennan testified that neither officer asked for permission to search the grey pouch.

Burns unzipped the pouch and said he found "something," which was heroin. The officers then arrested Levetan and searched him. They found on the defendant other packets of a white powder containing a small amount of an opiate. In the grey pouch, the officers also turned up about $1900 in cash. Searching a blue camera case lying in the open in the roomette, the officers discovered a small amount of "green plant material which was field-tested positive for THC." [3] Tr. at 12.

*According to Brennan, about five minutes passed between when the officers knocked on the door and when they arrested Levetan.* The sergeant said that he spoke to Levetan in a normal tone of voice all the while before the arrest. Brennan said he did not threaten or try to scare Levetan, nor make any promises to get him to agree to the search. Brennan testified that the officers' service weapons were out of sight the whole time. The sergeant also said that Levetan never changed his mind about agreeing to the interview or the search, nor gave any signs that he wanted the police to stop. Brennan said that he

never told Levetan that he did not have to keep talking with the officers or that he could turn down the request to search the roomette and luggage. Brennan testified that he did feel, however, that his statement that he could only search the bag with Levetan's permission conveyed that Levetan could refuse to permit the search. Until Levetan's arrest, Burns stood in the roomette's doorway, half in and half out of the compartment. According to Brennan, Burns did not join the conversation between Brennan and Levetan. Brennan agreed that Burns was blocking the door, adding, "If somebody would try to run out of it, they would have to knock [Burns] over."

Levetan's testimony both added to and contradicted Brennan's story in some places. In addition to the facts in Brennan's account, Levetan testified that after he asked Brennan what the interview was all about, he next questioned the officer whether the police were searching the other passengers on the train. According to Levetan, Brennan said yes, adding that they had already searched four or five others. The defendant also said that before searching the suitcases, Brennan asked Burns several times to hold the train and not to let it pull out of the station. For his part, Brennan said he could not recall Levetan asking at that point whether the officers were searching other passengers. The sergeant did say he thought Levetan might have asked the question later. Brennan also testified that to his knowledge he and Burns did not ask to have the train held, but he admitted that Burns might have done so.

In contradiction to Brennan's account, Levetan said that he only agreed to let Brennan talk to him. Levetan testified that he *did not answer* when Brennan asked if he could search the suitcases. The defendant repeated several times that Brennan first searched the brown suitcase, found nothing, then the blue camera case, again without turning up drugs, and then

---

**3.** The court takes notice that THC, tetrahydrocannabinol is the active ingredient in the illegal drug marijuana or cannabis. The defendant has not been charged before this court with any crime relating to the green plant material.

searched the suitcase taken down from the rack. This last had the grey pouch with heroin.[4]

The most important difference between the two witnesses' testimony concerns the exchange when Brennan wanted to search the suitcase on the rack. Levetan testified that Brennan saw the bag on the rack and asked if it was Levetan's. Levetan said it was, and Brennan asked if he could search that bag. According to Levetan, he told the officer, " 'Only if you have to,' and [Brennan] took the bag down and asked me if it was locked, and I replied, 'yes.' ... and he asked me to unlock the bag so he could search the bag, and at that point I asked him if it was necessary, and he replied, 'yes,' and I unlocked the bag, and he searched...." Tr. at 39.

Upon cross-examination, Levetan conceded that he never told the officers they could not search his bags. He also confirmed that Brennan and Burns were in plain clothes and that they did not yell or shout at him, nor draw their service weapons. Levetan said that after examining his driving license, Brennan returned it to him. The defendant could not recall whether the officer gave back the train ticket after examining it.

Mrs. Levetan testified only about the telephone call she had with someone from Amtrak on the day Brennan and Burns arrested her son. She said she received a call from a person who identified himself as being with Amtrak. The person wanted to know if a Mark Levetan lived there, and she said he did. Mrs. Levetan said the caller also asked where the defendant was. She testified that she answered that she would not say where he was. According to

Mrs. Levetan, she told the Amtrak agent that if he would leave a number, she would have her son get back in touch. The caller said this was not needed, and the conversation ended. Mrs. Levetan testified that she knew where her son was but she did not want to tell the caller this without learning the purpose of the call.

## II.

Based upon the testimony given at the hearing, as recounted above, the court will make the following findings of fact.[5]

First, in so far as it is uncontroverted, the court adopts Brennan's account of the events leading to Levetan's arrest. The sergeant has many years experience as a police officer, and he testified in convincing detail about what happened. He also refreshed his memory from police records made shortly after the arrest. Further, with the exception of the specific differences that the court has stated above, Levetan's testimony tended to confirm Brennan's version.

Second, where Levetan's testimony merely added detail to Brennan's, but did not specifically deny or contradict it, the court accepts these details as true. Specifically, the court finds that Brennan did state to Levetan that the officers had been interviewing or searching other passengers on the train. Levetan also overheard Burns or someone else discuss delaying the train's departure. The court makes these findings for the following reasons. By his demeanor and comportment on the stand, Levetan generally impressed the court as truthful. He admitted without prompting facts that do not help his case.[6] Nothing that he said

4. Brennan testified that the officers searched the blue camera bag after finding the heroin in the grey pouch in the suitcase on the rack. Brennan said the green plant material was in the camera bag. Levetan said the officers found nothing in it.

5. The court does not make any finding on when the officers searched Levetan's blue camera bag. It is not necessary to resolve the clear contradiction on this matter. The police have not charged Levetan for possession of the marijuana. Because Brennan testified that the camera bag was searched after the arrest, nothing found

in it can give rise either to probable cause or to reasonable suspicion that would aid the government in justifying the search.

6. For example, Levetan said that Brennan returned his driver's license. The defendant also said he could not recall whether Brennan gave back the ticket. Testimony that the police had kept these would support a conclusion that Levetan had been arrested or detained before Burns found the heroin. This could render the search illegal and result in the evidence being suppressed. Cf. Florida v. Royer, 460 U.S. 491, 503, 103 S.Ct. 1319, 1327, 75 L.Ed.2d 229 (1983) (as a

had the appearance of being coached or rehearsed. He testified coherently and naturally, giving reasonably complete answers without being led. When questioned at different times about the same thing, his story remained the same, but he expressed it in different words rather than parroting his earlier phrases.

Moreover, Brennan did not deny either of these facts. He seemed to start to say that he had not talked about searching other passengers, but then stopped and said he did not recall. He then conceded he might have spoken about this to Levetan, but thought he did so after the arrest. In any event, this is not the kind of statement that would necessarily be recorded in an arrest report. By his own account, Brennan conducts many of these interviews, and details must blur a little. On the other hand, this is an event in Levetan's life that he is likely to recall vividly.

Similarly, the court regards as ambiguous Brennan's statement that to his knowledge Burns did not speak about holding the train. In a different context, Brennan did say that Burns did not speak during Brennan's conversation with Levetan. This can readily be understood to mean that Burns did not join in the conversation. Brennan would have focussed his attention on speaking with Levetan, not on listening to a conversation Burns might have had on the radio. Levetan would have watched and listened to both officers.

Third, to the extent that Brennan's and Levetan's accounts conflict directly, the court essentially adopts Brennan's version as reflected in the following findings: Brennan noticed the suitcase on the rack and asked if it was Levetan's. Levetan answered yes. Brennan then asked if he could search the suitcase, and Levetan replied, "Only if you have to." Brennan then told Levetan that he could only search if he had permission and asked if the suitcase was locked. Levetan said yes. Brennan took the suitcase down from the rack and asked if Levetan would open the bag. Levetan replied, "Is this necessary?" Brennan again said that he needed permission to search, and Levetan unlocked the bag. Brennan took out the grey pouch. While Brennan looked through the suitcase, Burns searched the pouch and found the heroin.

The court makes this third finding based upon a thorough review of the transcript of both witnesses' testimony. More particularly, the findings are based upon the court's observation of the witnesses at the hearing. The court already has stated that it found both witnesses to be generally credible and truthful and has given detailed reasons for this. The court must recognize, however, that Levetan faces time in prison if he is convicted. If the evidence is suppressed, Levetan is not likely to be convicted. On the other hand, Brennan is a trained, experienced officer of the law. No doubt, he has a professional, and probably a personal, interest in seeing criminals brought to book. But, even making allowances for the "often competitive enterprise of ferreting out crime," *Johnson v. United States*, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948), a veteran officer knows that some apparently guilty persons nevertheless go free. Unless Brennan has been willing to risk his career and freedom by perjuring himself regularly, he must have learned to live with this fact of police life. Further, it does not appear that Brennan had ever heard of Levetan before. It is doubtful, therefore, that Brennan had any more animus against Levetan than any of the other suspected drug couriers that Brennan has interviewed on trains. The court cannot state that the record shows clearly which one of the two was inaccurate. On the balance of probabilities, therefore, when a choice must be made, the court will give Brennan's version the nod.

A clear choice need not and should not be made on every point at which Brennan's and Levetan's accounts vary, however. The facts stated under the third finding

---

practical matter arrest takes place when police take someone to small room away from airport concourse, keep his airline ticket and identification, and do not tell him he may leave); *United*

*States v. Battista*, 876 F.2d 201, 205 (D.C.Cir. 1989) (freedom to leave evaporates when police heep suspect's ticket and identification).

reflect this. Not only do these facts mostly accommodate what both witnesses testified to, but they also coincide with what each person expected to hear the other say.

Nothing in the record contradicts what is the most likely fact, which is that Levetan knew he was carrying heroin. Finding the police at his door talking about stopping the flow of drugs, Levetan must have felt he had one foot in a cell. Indeed, he became highly nervous and began to sweat. He also knew that a search of all of his bags surely would put both feet in the cell and his body behind bars. The court believes Levetan expected the police to insist on searching all of his bags.[7]

At the same time, based upon their experience, Brennan and Burns expected they probably would find some kind of illegal drugs. More important, their experience told them that Levetan probably would let them search the bags. The court asked Brennan if a defendant had ever told him he could not make a search. Brennan replied, "I have never had it happen to me in any compartment." Tr. at 16. He added that in all of the drug interdiction unit interviews he has had, the suspected courier almost never refused to let police search his bags. It has only happened "three or four, not many, not many, a couple" of times. *Id.*

The court, therefore, believes that much of what Brennan and Levetan said occurred did, in fact, happen. Each remembered the other doing and saying things that fit what that person expected the other to do. As a result, the court's findings include much of both Brennan and Levetan's testimony. For these reasons, the court determines the facts to be as stated in the third finding.

The court's final finding regards the telephone call to Mrs. Levetan. After speaking with her, Burns knew that he had reached a working number, and that the call-back number Levetan gave the Amtrak reservation agent was at his home. Mrs. Levetan told Burns that her son was not at home. She refused to tell Burns where he was for reasons of privacy. She did not, however, tell Burns that she did not know where he was. This last finding contradicts to some extent, Brennan's testimony. At the hearing, Mrs. Levetan also impressed the court as being truthful. The court acknowledges that mothers are wont to protect their sons, but Mrs. Levetan was the only party to the phone call who testified. The government did not directly rebut her version by putting Burns on the stand. The government's version of the call came from Brennan. Brennan did not speak with Mrs. Levetan, nor listen in on the call. The most he could say about the call was a second-hand account of what he remembered that Burns had told him. Hearsay may be admitted at evidentiary hearings, but it still is suspect. The court in no way hints that Brennan was untruthful, but he could only testify to what somebody else told him Mrs. Levetan said. Mrs. Levetan swore to what she knew she said. Moreover, Mrs. Levetan was not shaken at all on cross-examination.

To aid in gauging whether the officers had a reasonable suspicion of crime, the court will summarize what the officers knew about Levetan as Burns unzipped the grey pouch: (1) Levetan was travelling by train from New York to Atlanta on the return leg of a round-trip ticket;[8] (2) he

---

7. Compare the reaction of the defendant in *United States v. Savage,* 889 F.2d 1113, 1115–16 (D.C.Cir.1989). Confronted in a similar situation by a detective and the same Amtrak Agent Burns, Savage at first consented to a search. When the officers pressed further and asked to search another box, Savage gave up and blurted out "You got me. It's [cocaine] in there."

8. The cases suggest that New York is considered both a "source" and a "use" city for narcotics. See *United States v. Powell,* 886 F.2d 81, 82 (4th Cir.1989) ("source"); *United States v. Colyer,* 878 F.2d 469, 471 (D.C.Cir.1989) ("use"). People in Atlanta do not seem to be similarly suspect if they come and suspect if they go. In any event, the prosecution has not contended here that Levetan's departure from New York City by train was a factor that caused Brennan and Burns to single the defendant out for an interview. Brennan did not mention this in his testimony either.

The prosecution similarly does not contend that the round-trip ticket is suspicious either. On occasion, purchasing a one-way trip does seem to be considered peculiar, see *United States v. Battista,* 876 F.2d 201, 202 (D.C.Cir.1989) (pay-

paid cash for his ticket;[9] (3) his reservation, ticket, and driver's license with a photo were all in the same name, and he was thus not travelling under an assumed name; (4) the call-back number given when Levetan made the reservation worked and rang through to his home, where his mother answered the phone; (5) the phone number's area code was that of both Levetan's destination and his residence as shown by his driver's license, and (6) Levetan grew nervous and got sweaty when two police officers came to his room and asked to question him and search his luggage.

The court will next summarize the encounter as it would have seemed to a reasonable person trying to decide if he were free to walk away from the interview. This will aid in gauging whether Levetan had been seized or was still in a position to agree voluntarily to let Brennan and Burns search his bags. The reasonable person, that is one not carrying any drugs or committing a crime, would have faced this situation:[10] (1) while the train is stopped in a strange city that is not the person's destination, he meets (2) two police narcotics officers in casual clothes (3) who come to the tiny room and (4) without drawing their guns, enter the room and block the door so that the way to leave is to "knock [one officer] over," (4) in a normal voice, ask questions about his itinerary, (5) in a normal voice, request to see a ticket and identification, (6) being unsatisfied with the answers given thus far, want to search the room and luggage, admitting they need permission, (7) suggest they are searching other persons on the train and (8) indicate

they might hold the train over until they finish asking questions and searching.

## III.

The court will now apply the law to the facts as found above. Upon a review of the authorities, the court concludes that it must grant defendant's motion.

■ First, the court concludes as a matter of law that at no time before finding the heroin did Brennan and Burns have a reasonable, articulable suspicion that Levetan was committing a crime.[11] Such a suspicion is necessary to justify a limited seizure or investigatory detention short of arrest permitted by the line of cases under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

■ In this instance, the police really knew only two unusual things about Levetan: he had paid for his ticket in cash and he seemed tremendously nervous and sweaty during the interview. Whether police have a reasonable suspicion depends on " 'the totality of the circumstances—the whole picture,' " *United States v. Sokolow,* — U.S. —, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1985). It is "inevitably a fact-based inquiry," *United States v. Battista,* 876 F.2d 201, 205 (D.C.Cir.1989). A review of the cases evaluating the factors that lead to reasonable suspicion shows that the officers' knowledge about Levetan does not pass muster.

In *Reid v. Georgia,* 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980), the court held that a police officer "could not as a

ment in *cash* for *one-way* train travel from *"source city"* of Ft. Lauderdale, Fla., and Newark, N.J., recognized as factors associated with possible drug courier activity) (emphasis in original). Presumably, nearly everyone who travels without moving permanently contemplates going home and might, therefore, want a round-trip ticket.

9. Again, the prosecution did not put into evidence the price of a ticket, so the court does not have before it any information that suggests that the officers knew Levetan must have paid for his ticket with a lot of cash in small bills. *Cf. United States v. Sokolow,* — U.S. —, 109 S.Ct. 1581, 1582, 1586, 104 L.Ed.2d 1 (1989) ("paying $2100 in cash for two airline tickets"

from "roll of $20 bills containing nearly twice that amount of cash" taken with other factors may raise reasonable suspicion of criminal activity).

10. "A reasonable person ... is one innocent of any crime," *United States v. Savage,* 889 F.2d 1113, 1117 (D.C.Cir.1989).

11. If police lacked reasonable suspicion, they necessarily could not have had probable cause either. The showing for reasonable suspicion "is quite obviously, 'less demanding' than the showing required for probable cause." *United States v. Colyer,* 878 F.2d 469, 480 (D.C.Cir. 1989).

matter of law, have reasonably suspected ... criminal activity on the basis of these observed circumstances," *id.* at 440–41, 100 S.Ct. at 2754: (1) travel from a drug source city, (2) arrival at a destination at a time when law enforcement activity is diminished, (3) an apparent attempt to conceal that two persons were travelling together, and (4) no luggage other than shoulder bags on an airplane trip. *Id.*[12] This court believes that Brennan and Burns had no greater quantum of knowledge to give rise to suspicions about Levetan than did the officer in *Reid*.

The cases from this circuit reinforce such a conclusion. In *Battista*, before deciding to interview Battista, police learned that he had (1) reserved a one-way train ticket from Florida to New Jersey, (2) had taken a roomette, and (3) had paid cash for the ticket about 40 minutes before the train departed. *Battista*, 876 F.2d at 202. Fourth, the officer also found out that Battista's call-back phone number was out of service. *Id.* at 203. The court held that police seized Battista in an investigatory detention when they asked for and kept his ticket and identification almost immediately after they began questioning him at his roomette. *Id.* at 205. In evaluating whether the police officer had sufficient reasonable suspicion to justify the seizure, *Battista* recognized that police knew that the suspect had paid cash for his ticket. But as here "there is no evidence that this mode of payment was as conspicuous as the peeling off of more than $2,000 from a wad of $20s." *Id.* Noting that Battista did not seem nervous, which differs from the facts here, the court said, "if there were no more grounds for an investigative detention of Battista beyond this limited information, we might be reluctant to find that the detention was justified." *Id.* at 206. Ultimately, *Battista* justified the detention because police also knew that a dog trained to sniff out narcotics had indicated or "alerted" that Battista's room had illegal drugs in it. *Id.* at 206.

Comparing police knowledge about Battista before they seized him and what the officers knew about Levetan before finding the heroin, this court cannot see a basis for reasonable suspicion. Admittedly, Levetan was extremely nervous, which Battista was not. But this court believes that the most tellingly suspicious aspect of Battista's behavior was giving an out-of-service callback number, which Levetan did not do. A review of the facts in the two cases indicates that both men paid cash and took a roomette for long trips; and Levetan was nervous while Battista was not. But Battista bought a one-way ticket, and he had given a false call-back number. Even with these two extra factors pointing to Battista, the court was reluctant to find the necessary basis for suspicion. This court feels that the lesser basis in Levetan's case show that Brennan and Burns lacked reasonable suspicion.

Similarly instructive is *United States v. Carrasquillo*, 877 F.2d 73 (D.C.Cir.1989). In *Carrasquillo*, the court held that police had reasonable suspicion, although not probable cause, to detain the suspect when they knew he (1) "was travelling from a 'cocaine source city,'" (2) "made a one-way reservation on short notice and changed the date only a few minutes before departure," (3) "had paid in cash," (4) "had provided no contact telephone number," (5) "had arrived at the station just before the train left, (6) "was travelling under an assumed name and had used a second assumed name in making the first reservation," (7) "was visibly nervous when the officers approached," and (8) either was "carrying no luggage" on a long trip or "falsely denied that the bag under his seat was his." *Carrasquillo*, 877 F.2d at 77. Of these eight factors, only the first, third, and seventh compare with Levetan's situation. The court recognizes that reasonable suspicion is not a matter of counting up factors. But, as in *Battista*, the most suspicious factors in Carrasquillo's situation

---

12. *Reid* relied on the view that the police officer's approach to the suspects required reasonable suspicion. *Id.* at 440, 100 S.Ct. at 2753. It is now clear that officers may approach persons in public and seek to engage them in conversation. This view does not at all undermine *Reid's* validity as an assessment of what constitutes reasonable suspicion, however.

are absent in Levetan's: the false names, no call-back number, lying about luggage, one-way ticket, unusual change in travel plan.

In *United States v. Colyer,* 878 F.2d 469 (D.C.Cir.1989), the court only sought minimal suspicion sufficient to justify a dog sniff. The court had already held that the sniff was not a search implicating the fourth amendment, *id.* at 477, but sought to provide an alternative holding. The court noted that any basis for police suspicions derived "from facts which were suspicious, if at all, *only when viewed in the aggregate." Id.* at 480. (Emphasis added.) *Colyer* reviewed these factors: (1) travel from a source city, which is present here; [13] (2) purchase of a ticket seven minutes before the train departed, a factor not present here; (3) a one-way ticket to New York while leaving a Florida telephone number, the exact opposite of the facts here; and (4) payment in cash, a factor present here. *Id.* at 481–82. *Colyer* specifically notes that the suspiciousness of payment in cash may be undercut when the traveller makes a reservation in his true name and leaves a correct telephone number. *Id.* at 482. The police in *Colyer* did not have this "mitigating" information at the point at which their suspicions were tested, so the court did not consider this further. Here, however, Brennan and Burns knew both these facts. Considering *Colyer's* emphasis on viewing the facts "in the aggregate," this court believes that Brennan and Burns could not have had a basis for a minimal reasonable suspicion about Levetan.

Upon this analysis of the authorities, the court holds that at no time did Brennan and Burns have sufficient suspicion to justify an investigative detention or *Terry* stop. ▆ Indeed, the prosecution does not try to shoehorn these facts into an investiga-

tive detention based upon a reasonable suspicion. Instead, the prosecution seeks to justify the search only on the ground that "defendant voluntarily cooperated with the questioning. This type of interaction, where the police question a citizen and the person voluntarily cooperates with the police, has been specifically approved of by the Supreme Court in *Florida v. Royer,* 460 U.S. 491 [103 S.Ct. 1319, 75 L.Ed.2d 229] (1982)." Govt's Mem. in Opp. at 3.[14] The court's first conclusion of law becomes important if the court further holds that Brennan and Burns did seize Levetan. If Levetan consented to the search during a "permissible police encounter in a public place, or a justifiable *Terry*-type detention, [his consent], if voluntary, would have been effective to legalize the search" that found the heroin. *Royer,* 460 U.S. at 501, 103 S.Ct. at 1326 (plurality opinion); *see United States v. Brady,* 842 F.2d 1313, 1315 (D.C. Cir.1988) ("warrantless search approved by consent is wholly valid"). If, however, Levetan was either arrested without the necessary probable cause or temporarily detained without the required reasonable suspicion, he was unlawfully seized, and his consent to search would be tainted. *See Wong Sun v. United States,* 371 U.S. 471, 484–85, 83 S.Ct. 407, 415–16, 9 L.Ed.2d 441 (1963); *cf. Carrasquillo,* 877 F.2d at 77 (statement not effective to waive right when product of illegal detention, citing *Royer,* 460 U.S. at 497, 103 S.Ct. at 1323 (plurality opinion)). Such tainted consent would not be effective to legalize the search. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 228, 93 S.Ct. 2041, 2048, 36 L.Ed.2d 854 (1973) (no matter how subtly police coercion applied, resulting 'consent' no more than pretext for unjustified police intrusion against which Fourth Amendment directed).[15]

The court's second conclusion of law is that the interview the officers had with

---

**13.** Actually, Brennan did not testify to this. The presence here arises from judicial notice.

**14.** This court notes that while dicta in *Royer* support the prosecution's position, the Supreme Court held that an initially voluntary encounter with police "escalated into an investigatory procedure," *Royer,* 460 U.S. at 503, 103 S.Ct. at 1327

(plurality opinion), and then became an a full-scale arrest. *Id. Royer* affirmed a decision to reverse the denial of a motion to suppress.

**15.** *Schneckloth* held that a valid consent to search had been given when police stopped a car for traffic violations.

Levetan escalated into an investigatory detention. Being without reasonable suspicion, this was unlawful.

At the outset, Brennan and Burns were free to seek out Levetan on the train. "It was perfectly lawful for the agents to approach the defendant on the train and ask him if he was willing to answer some questions, whether or not the agents had a reasonable suspicion." *Carrasquillo,* 877 F.2d at 76. To determine if the this approach became a seizure, "[t]he relevant test for assessing whether a 'seizure' has occurred focuses on 'whether a reasonable person would conclude from the circumstances, and the show of authority, that he was not free to leave the officer's presence.'" *Battista,* 876 F.2d at 204, quoting *Brady,* 842 F.2d at 1314; see *Savage,* 889 F.2d at 1116 ("police 'seize' a person within the meaning of the fourth amendment '"'only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave,'"'" citing *Michigan v. Chesternut,* 486 U.S. 567, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988), quoting *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.)).

*Savage* instructs that the freedom to walk away must be analyzed in terms of "the police's conduct during the encounter, ... the setting of the encounter ... any other detail in the record that might lead a reasonable person to believe that he is not free to 'disregard the police presence and go about his business.'" *Savage,* 889 F.2d at 1116. (quoting *Chesternut,* 108 S.Ct. at 1981) (other citations omitted).[16]

In evaluating police conduct, this court recognizes that Levetan's situation at least superficially resembles those in *Brady, Battista, Carrasquillo,* and *Savage,* all of which review police approaches to persons on trains. As in those cases, Brennan and Burns were in plain clothes, did not show their weapons, and did not shout at or threaten Levetan, nor rough him up.

Moreover, "a request by the police does not, by itself, constitute a fourth amendment seizure ... and ... the 'encounter does not become a "seizure" merely because the officer does not tell the person [they question] that he may refuse to answer the questions and is free to leave.'" *Savage,* 889 F.2d at 1116, quoting *United States v. Lloyd,* 868 F.2d 447, 451 (D.C.Cir. 1989).

In discussing the setting of the encounter, *Savage* states that the presence of police officers at the door to the roomette, effectively blocking the door, does not prevent a reasonable person from declining to talk with police. *Battista* is of equal weight, however, and this court believes it is the more reasonable of the two decisions. It suggests that when a person's only "conceivable retreat would be to close the door on the officers and remain in the roomette— ... there is no heightened expectation of privacy in a train roomette ...—it would be small solace to direct our reasonable person back inside if what he wishes is simply to be left alone. *Battista,* 876 F.2d at 204–05. This court notes that Brennan specifically testified that Levetan would virtually have had to knock Burns over to get out of the room. It might be true that had Levetan said he wanted to leave that he could have gone through the door without having to go through Burns. But the question is not what the officers thought but what a reasonable person would have thought. The court believes that such a person would have viewed his option in much the way Brennan described it.

In discussing other details in the record that might cause a reasonable person to conclude he was not free to leave, it is important to remember that *Battista* and *Savage* both concluded that during *the course* of a lawful interview with a suspect on a train, police actions escalated into a detention. *Battista* held that the combination of the early morning hour of 6:30 a.m., Battista's partial undress, and police keep-

---

**16.** This is an objective test. Brennan testified that he would have cut short the interview had Levetan asked him to, and Levetan testified that he did not feel free to leave. Not only do these tend to cancel each other out but the cases indicate that such subjective impressions, essentially unprovable and subject to after-the-fact adjustment, bear little if any weight.

ing his ticket and identification resulted in a detention. *Battista*, 876 F.2d at 204–05. In *Savage*, the interview became a detention when the officer learned that the defendant was using an assumed name and began to question him more forcefully. *Savage*, 889 F.2d at 1117.

This court similarly believes that there are a number of details in the record here that, when taken with the rest of the circumstances of the interview, would lead a reasonable person to believe either that he was not free to leave or end the interview.

As suggested in *Battista*, the freedom to leave is much the same as the ability to get the police to leave one alone. In Levetan's case, the court has found as fact that Levetan had been told that the police were searching others on the train. The court also found that Levetan understood that the train might be held over until the officers finished their questioning and requested search. A reasonable person is unlikely to believe that he alone can walk away from police when he is one of a group of persons being questioned. The second fact reinforces the same conclusion. A reasonable person cannot feel free to walk away from police when he knows his means of getting home is to be held over until the officers are finished with their business of questioning him.

The court also considers that a reasonable person believes that after giving satisfactory answers to police questions, the officers will conclude their interview. Not only did the police here learn nothing to create, confirm, or heighten any suspicion, but Levetan told them things that should reasonably have tended to dispel suspicion. He produced a ticket and driver's license that matched each other and the reservation. His answers about his time in New York squared with what the officers knew otherwise. A reasonable person may be forgiven for thinking he is not free to leave when the response to his truthful co-operation is a statement that his interviewers are narcotics officers trying to stop drugs who would like permission to search his room and bags.

At the end of the second section above, the court listed all the factors confronting the reasonable person in Levetan's situation. In the totality of these circumstances, the court holds that Levetan had been detained before Burns unzipped the grey pouch. Although the initial police contact was not a seizure, the course of Brennan's and Burn's activity would cause a reasonable person to feel he could not end the encounter and leave the scene. When this conclusion is combined with the holding that Brennan and Burns never had a reasonable suspicion to justify the detention, the court must rule that Burns' search of the grey pouch was unlawful. Levetan had been unlawfully seized, and he could give no valid consent to search. Without consent, and with no warrant or probable cause, Brennan and Burns had no authority in law to conduct the search that found the heroin. On this basis alone, the court must rule in favor of defendant's motion.

■ The court's third conclusion of law is an alternative basis for granting the defendant's motion. The court holds that even if police conduct here did not escalate into a detention or seizure, Levetan did not freely and voluntarily consent to the search.

Once again, the court must undertake a fact-based analysis of the totality of the circumstances. *Schneckloth*, 412 U.S. at 227, 93 S.Ct. at 2047; *Battista*, 876 F.2d at 207. When the prosecution "seeks to rely upon consent to justify the lawfulness of a search, [it] has the burden of proving that the consent was, in fact, freely and voluntarily given," *Bumper v. North Carolina*, 391 U.S. 543, 549, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968). Obviously, a defendant's actions and demeanor, as well as his words, are included in the circumstances. So, too are the actions of the police, and the prosecution's "burden [of proof of voluntariness] cannot be discharged by showing *no more than acquiescence to a claim of lawful authority.*" *Id.*

In this situation, a number of the circumstances considered in the court's analysis of whether a detention occurred again play a key role in deciding whether Levetan

voluntarily consented. The cases point up the initial importance of the police officers' actions when asking for Levetan's consent first to speak with them and then to search his roomette. *Battista,* 876 F.2d at 206–07; *Lloyd,* 868 F.2d at 451; [17] *Brady,* 842 F.2d at 1315.

As noted, Brennan and Burns did not shout or threaten; they were in plain clothes, and they kept their weapons holstered. The court also recognizes that other criteria stated in *Schneckloth* and reiterated in *Lloyd* and *Battista,* do not militate against a finding of voluntariness. Nothing in the record suggests that Levetan's age, lack of intelligence or poor education vitiated any consent. *Battista,* 876 F.2d at 207, quoting *Lloyd* and *Schneckloth.* Nor does it appear that there was a prolonged detention or repeated questioning. Last, Brennan did tell Levetan, perhaps ambiguously, that the search could only go forward with his permission.

In reviewing the alleged consent to search, the court considers it useful to note that there are two possible consents to compare in this case. The first is Levetan's undoubtedly voluntary consent to speak with the police when they knocked on the door to his roomette. This is a clear example of consent freely given. Levetan conceded that he agreed to speak with Brennan and Burns. His consent is reflected in the prompt response in producing his ticket and license when asked, and the testimony about his demeanor at this early stage of the encounter. This is when Brennan described Levetan as calm. Shortly afterward, Levetan got extremely nervous, and began to sweat. He asked if it was necessary to search the suitcase on the rack.

Not only may this be distinguished from his earlier apparent willingness to cooperate with Burns and Brennan, but it is also to be contrasted with the consent given in *Schneckloth,* where the subject "actually helped in the search." The court finds it hard to square voluntary consent with Brennan's testimony about Levetan's reluctance.

Rather than reading voluntary consent into what took place when Brennan sought to search Levetan's luggage, the court believes that another explanation more correctly characterizes Levetan's response. It appears that Levetan did what Brennan requested because he believed he had to. In the court's view, Levetan was complying with a request made under color of authority.

Here, two of the facts discussed in the detention issue have great significance: Levetan understood that the officers were searching other passengers and the officers planned to hold the train. "In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subject state of the person who consents." *Schneckloth,* 412 U.S. at 229, 93 S.Ct. at 2048. The knowledge that police are searching a group of other persons must have at least subtly coerced Levetan into believing that the police could lawfully search his bags whether he consented or not. Moreover, Levetan clearly was in a vulnerable subjective state of mind, as evidenced by his nervous sweating. He also was in an objectively vulnerable state of mind because he had heard that the police could hold the train over. This must have confirmed the view that the officers could have carried the search out regardless of his consent.

For these reasons, it appears to the court that the totality of the circumstances in Levetan's situation make out a poor case for a voluntary consent. Indeed, the image of an individual in a small room, sweating and nervous, facing two police officers who are searching other passengers and who can hold the train does not suggest an unforced willingness to cooperate or consent. It suggests instead someone who grudgingly assists police officers in doing what they have come in order to do to minimize the damage to property. The

---

**17.** The encounter with police during which the defendant in *Lloyd* consented to a search took place outside the train station at the taxi line and not on the train. Id. at 449.

prosecution cannot be said to have met its burden of showing voluntary consent, and, indeed, it appears Levetan did not consent to the search.

Having held that Levetan has not been proved to have consented to the search of his bag voluntarily, regardless of whether he was seized, it again follows that the search of his bag cannot be held to be lawful. On this second ground, the court again decides that it must grant defendant's motion to suppress.

## IV.

In conclusion, the court holds the following: (1) until they found the heroin in his bag, Brennan and Burns had no reasonable suspicion to justify detaining Levetan; (2) by the time Burns began to search Levetan's grey pouch, Levetan had been subjected to an investigatory detention and thus had been seized unlawfully in violation of his Fourth Amendment rights; any consent to search the bag procured under such circumstances is invalid, and the search was unlawful; and, (3) whether or not Levetan had been seized, it has not been demonstrated that Levetan voluntarily consented to the search of his grey pouch; the police otherwise lacking probable cause or a warrant for the search, the search was unlawful.

As a result of the foregoing, the court will grant Levetan's motion to suppress.