**UNITED STATES of America**

v.

**Thomas SAVAGE, Appellant.**

**No. 89–3052.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 16, 1989.

Nov. 17, 1989.

Joseph F. Green, Jr., appointed by this court, for appellant.

Linda L. Mullen, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John R. Fisher and Helen M. Bollwerk, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before WALD, Chief Judge, RUTH BADER GINSBURG and SILBERMAN, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

In this appeal, appellant challenges the district court's denial of his motion to suppress statements and evidence that stem from his encounter with detectives aboard an Amtrak train during its short stopover at Union Station, Washington, D.C. We think the district court's ruling was proper and therefore affirm the conviction.

## I.

On April 27, 1988, Amtrak representatives in Washington, D.C. provided Detective John A. Centrella, a member of the Narcotics Squad of the District of Columbia Metropolitan Police Department assigned to the Amtrak Drug Interdiction Unit at Union Station, with the following information regarding a passenger who would be traveling through Union Station on Amtrak that day: The passenger (1) under the name, "Bob Jones"; (2) purchased a round-trip ticket on the same day on which he had made his reservation; (3) from West Palm Beach, Florida to Baltimore, Maryland and back; (4) reserving a sleeper car (roomette) for the trip to Baltimore, but only a coach seat for the return trip to West Palm Beach; (5) used cash; (6) and provided Amtrak with only a pay telephone number for confirmation.

Detective Centrella associated these circumstances with those under which drug couriers are likely to travel. According to Centrella's testimony in the district court, many drug couriers prefer to travel under simple, common aliases. Florida is known to law enforcement authorities to be a source area for cocaine distributed along the East Coast. Drug couriers are likely to desire privacy while transporting drugs but are indifferent to it after having delivered them. And, travelers offering pay telephone numbers for confirmation are likely not to have a residence in the state from

which they are calling or want to ensure that the location of their residence cannot be verified.

According to Centrella's account, which the district court credited, Centrella decided to board "Jones's" train, accompanied by Amtrak Investigator Calvin Burns, to interview him during the train's twenty minute stopover at Union Station. Centrella and Burns knocked on the door of the sleeper car reserved for "Bob Jones" and the occupant of the car answered, "yes?" One of the officers replied, "Amtrak," and "Jones" slid open the roomette's door. Centrella then identified himself as a police officer and asked if he could talk with "Jones," to which "Jones" replied, "sure." Centrella asked appellant his name and residence, and "Jones" stated that he was "Bob Jones" of Baltimore. In response to Centrella's question whether he had any identification, "Jones" patted his chest, looked overhead to his suitcase, and replied that he did not. When Centrella then asked him where and for how long he had stayed in Florida and whether he had a train ticket, "Jones" produced and handed to Centrella a ticket with the name "Bob Jones" on it.[1]

Centrella chatted with "Jones," explaining that he was a member of the drug interdiction team in Washington, that the District was experiencing problems with drugs, and that Florida is a source of the majority of the cocaine coming to the East Coast. He then asked "Jones" for permission to look in a small brown suitcase in the sleeper car's overhead rack which "Jones" had identified as his own. "Jones" replied, "sure," brought down the suitcase, and handed it to Centrella, who was standing in the train's aisle.[2] Centrella handed the bag to Burns, who began to search it in the aisle.

While Centrella continued talking with "Jones," Burns handed him two pieces of identification from the suitcase bearing the name "Thomas Savage." The district court

found that, at this point, Centrella's questioning became "direct and probably forceful." Centrella asked "Jones" who "Savage" was, and "Jones" answered, "It's me." When Savage was then asked why he was using an assumed name, Savage did not answer, his voice began to crack, and he became uncomfortable. Centrella then pointed to a white cardboard box on the sleeper car's overhead rack and asked Savage about it. Savage answered that it was a gift of crystal for his mother. Centrella asked if he could look at it. Savage replied, "well ...," then brought down the box and placed it on the floor in front of Centrella. Centrella again asked Savage if he could look in the box, and Savage again replied, "well...." Centrella then reiterated to Savage the question why he was not traveling under his proper name, and Savage again gave no response. Instead, he stated, "You got me. It's in there." Centrella asked, "What's in there?" and Savage answered, "the cocaine." Centrella asked "How much cocaine?" and Savage responded, "three kilos." Centrella then arrested Savage, searched the box, found in it three kilograms of cocaine, and escorted Savage off the train. The entire exchange lasted between five and ten minutes.

Following his indictment for possession with intent to distribute more than 500 grams of a cocaine mixture, 21 U.S.C. §§ 841(a) and 841(b)(1)(B)(ii)(II), Savage moved to suppress the statements made and evidence seized during the encounter on the ground that they were obtained in violation of his fourth amendment rights. The district court at a hearing on the motion ruled from the bench that the evidence was admissible. Savage subsequently pled guilty to the charge in the indictment while reserving his right to appeal the district court's denial of his motion to suppress.

## II.

Appellant contends that his encounter with Detectives Centrella and Burns was

---

1. The record is silent on when or whether Centrella returned the ticket.

2. Appellant testified that before the officer requested from him permission to search the suitcase, he "flipped the bag open, trying, you know, to show them there was nothing there that I was trying to hide from them."

an investigative "stop," from the outset, unsupported by articulable facts reasonably warranting the intrusion. *See Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). The government argues, *inter alia,* that the officers had reasonable grounds to stop Savage from the time they initially approached him in his sleeper car. Alternatively, the government contends, as the district court found, that if Savage was "stopped" within the meaning of the fourth amendment, it was only after the officers had reasonable cause to do so—after the officers discovered that Savage was traveling under an alias.

Police "seize" a person within the meaning of the fourth amendment " 'only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' " *Michigan v. Chesternut,* 486 U.S. 567, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988) (quoting *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.)). Of course, a reasonable person, for purposes of this determination, is one innocent of any crime. *See United States v. Castellanos,* 731 F.2d 979, 983 (D.C.Cir.1984). "[A] guilty mind ... is especially prone to apprehensions of confinement." *United States v. Brady,* 842 F.2d 1313, 1315 n. 3 (D.C.Cir.1988).

■ In distinguishing between consensual encounters with law enforcement officials that need not be supported by articulable suspicion and those that intrude upon constitutionally protected interests and must therefore be shown to be reasonable, we consider factors bearing on the extent to which the encounters are objectively intimidating. *See, e.g., Michigan v. Chesternut,* 486 U.S. 567, 108 S.Ct. 1975, 1981, 100 L.Ed.2d 565 (1988); *INS v. Delgado,* 466 U.S. 210, 216, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984). Such factors include the police's conduct during the encounter, *see United States v. Brady,* 842 F.2d at 1314, the setting of the encounter, *see United States v. Battista,* 876 F.2d 201, 204 (D.C.Cir.1989) (appellant seized when officers roused him in early morning and in partial state of undress), and any other detail in the record that might lead a reasonable person to believe that he is not free to "disregard the police presence and go about his business," *Michigan v. Chesternut,* 108 S.Ct. at 1981.

To be sure, it is the totality of the circumstances of each case to which we look in determining whether a fourth amendment seizure has occurred. *See id.* at 1979. It is nevertheless instructive to note instances of *particular* police behavior that do not, by themselves, constitute seizures; for those examples of behavior must be altered in some constitutionally meaningful way if they are to be accorded fourth amendment significance. For example, a request by the police for identification does not, by itself, constitute a fourth amendment seizure. *See INS v. Delgado,* 466 U.S. 210, 216, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984). And we have held that the encounter "does not become a 'seizure' merely because the officer does not tell the person [being questioned] that he may refuse to answer the questions and is free to leave." *United States v. Lloyd,* 868 F.2d 447, 451 (D.C.Cir.1989).

■ Accordingly, when Centrella and Burns asked Savage if he had any identification, and when he could produce none and they asked to see his train ticket, the detectives did not effect a seizure. Centrella then told Savage that he was a member of Washington's drug interdiction team. But he did not, as in *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), tell him that he was suspected of transporting narcotics. *See id.* at 494, 103 S.Ct. at 1322. Nor did the detective, again as in *Royer,* ask Savage to accompany him to a police room for further questioning. *See id.* Savage argues that Centrella and Burns "blocked the door" of Savage's compartment and the adjacent corridor. But nothing in the record indicates that the detectives prevented Savage from leaving his compartment. At no time did Savage ask Centrella to stop questioning him or make any request or effort to leave his roomette. The presence of the

detectives in the doorway of the compartment and its adjacent aisle did not, we believe, prevent a reasonable person in Savage's position from declining to talk with the police or from leaving the compartment. *See INS v. Delgado*, 466 U.S. at 219, 104 S.Ct. at 1764 (presence of agents by factory exits posed no threat of detention to workers). The detectives' positions were compelled by the location in which they were conducting their interview; there was no other place for them to stand.

With regard to the setting of the encounter, we have found "no merit in [the] ... suggestion[ ] ... that the narrowness and confinement of a train compartment are inherently isolationist, hence coercive." *United States v. Brady*, 842 F.2d 1313, 1315 n. 5 (D.C.Cir.1988). Nor was the time at which Savage was questioned unusual, as it was in *United States v. Battista*, 876 F.2d 201 (D.C.Cir.1989). In that case, the fact that officers roused Battista from the bed of his roomette at 6:30 a.m., causing him to answer the door while only partially dressed, was one of "several subtle factors" that we believed would cause a reasonable person to conclude that he was not free to leave the officers' presence. *See id.* at 204. Here, the detectives' encounter with Savage occurred at approximately 3:45 in the afternoon, and nothing in the record indicates that Savage was peculiarly vulnerable as would be a man awakened from bed in the early morning. Finally, Centrella testified, and the district court credited, that his voice and demeanor while talking to Savage were "low-keyed and informal" and that he had no physical contact with Savage until his arrest. Savage testified that no officer brandished a gun during their conversation. In sum, there is no indication in the record that a reasonable person in Savage's situation would have felt obligated to entertain Centrella's questions as a result of an aggressive show of authority by the agents.

■ When Detective Centrella asked Savage if he might search his suitcase, the encounter was still consensual. The detective requested Savage's permission to see the bag, and appellant was free to refuse. Indeed, the district court found that Savage, "having nothing, he thought, to conceal with respect to the bag and under the circumstances wishing to allay any suspicions that these agents might have had was probably very compliant in turning the bag over." *See also supra* note 2. We do not believe, therefore, that Savage's encounter with Detectives Centrella and Burns, up to this point, implicated the fourth amendment.[3] Insofar as Savage felt any restraint in his dealings with Detectives Centrella and Burns at this stage, it was due to his apprehension that refusal to cooperate would bring suspicion upon himself. But that concern—which an innocent man would not share—is not a factor that bears on fourth amendment analysis.

The district court concluded, and we agree, however, that Savage's encounter with the detectives became an investigative "stop," requiring the support of articulable facts for justification, once Detective Burns discovered Savage's true identity. *See Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). It was then that Detective Centrella's repeated questioning of Savage, inquiring about his assumed name, became "forceful," although

---

**3.** Even were the district court to have found that the detectives never returned Savage's train ticket to him, *see supra* note 1, we would still view this portion of the encounter to be consensual. While failing to return a traveler's ticket after sufficient time to peruse it has elapsed and as his train is about to depart without him may well be tantamount to a detention, *see Florida v. Royer*, 460 U.S. 491, 493–94, 501, 103 S.Ct. 1319, 1321–22, 1326, 75 L.Ed.2d 229 (passenger proceeding to airline boarding area seized when officers, *inter alia*, failed to return driver's license and airline ticket), Savage's situation was much different. Savage, on his way to Baltimore, was in the sleeper car of his train, unrestrained from going about his "ordinary business" of sitting in the car, while Centrella held his ticket. *See INS v. Delgado*, 466 U.S. 210, 218, 104 S.Ct. 1758, 1763, 80 L.Ed.2d 247 (1984) (no seizure when employees free to go about their ordinary business while agents surveyed the work force in search of illegal aliens). This case also differs in important respects from *United States v. Battista*, 876 F.2d 201 (D.C.Cir. 1989), where our "finding of a seizure in th[e] case flow[ed] from the combination of the minimal show of police authority with the peculiar time and setting of the encounter *and* the retention of the suspect's identification [driver's license]." *Id.* at 206 n. 7 (emphasis added).

it was certainly not yet an arrest. The detectives had not asked Savage to move from his roomette, *see Florida v. Royer*, 460 U.S. 491, 504–05, 103 S.Ct. 1319, 1328, 75 L.Ed.2d 229 (1983) (suspect seized when officers requested him to accompany them to police room, approximately 40 feet away, for questioning), and the entire encounter had not extended to even ten minutes, *see Edler v. United States*, 761 F.2d 807, 808–09 (D.C.Cir.1985) (duration of stop critical to determining its reasonableness).

 The level of suspicion required to justify a detention short of an arrest is lower than the probable cause required for a valid arrest. *See United States v. Brignoni–Ponce*, 422 U.S. 873, 880, 95 S.Ct. 2574, 2579, 45 L.Ed.2d 607 (1975). To support an investigative stop, it is sufficient that the facts present and the rational inferences to which these facts give rise, reasonably warrant the intrusion, *Terry v. Ohio*, 392 U.S. at 21, 88 S.Ct. at 1879, which again requires us to evaluate "the totality of the circumstances—the whole picture," *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981). We think that when one combines the information with which the detectives first approached Savage, Savage's initial claim that he was carrying no identification, their discovery that Savage was traveling under an alias, and Savage's visible nervousness on being questioned about the alias, the officers were provided with articulable facts from which flowed the reasonable suspicion necessary for making the stop. *See, e.g., United States v. Sokolow*, —— U.S. ——, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989); *United States v. Colyer*, 878 F.2d 469 (D.C.Cir.1989); *United States v. Carrasquillo*, 877 F.2d 73 (D.C.Cir.1989). Since the investigative stop was lawful, Savage's admissions that his cardboard box contained three kilograms of cocaine were untainted. *See Berkemer v. McCarty*, 468 U.S. 420, 439–40, 104 S.Ct. 3138, 3149–50, 82 L.Ed.2d 317 (1984) (officer may question detainee during investigative stop to obtain information confirming officer's suspicions). Once Savage admitted that he was transporting cocaine in his box, the officers had probable cause to arrest him. *See Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964). And Savage's lawful arrest carried with it the authority to conduct a contemporaneous search of his cardboard box incident to his arrest since the box was then in the roomette, within Savage's immediate grasp.[4] *See United States v. Brown*, 671 F.2d 585, 587 (D.C. Cir.1982) (contemporaneous search of small pouch held lawful when within reach when arrest occurs).

\* \* \*

We believe that Savage's initial encounter with officers Centrella and Burns was consensual, that when the encounter escalated to an investigative stop, it was supported by reasonable cause, and that the officers' search of Savage's cardboard box was lawful incident to his arrest. We therefore affirm the conviction.

---

**4.** The district court erroneously determined that the search of the box was proper because the police had probable cause to believe it contained cocaine. *See United States v. Place*, 462 U.S. 696, 701, 103 S.Ct. 2637, 2641, 77 L.Ed.2d 110 (1983) (existence of probable cause does not negate need for a search warrant unless a warrant exception applies). We affirm the district court's ruling on the ground that the search was made incident to a lawful arrest. *See United States v. Garrett*, 720 F.2d 705, 710 (D.C.Cir. 1983) (appellate court may affirm decision even if trial court relied upon deficient ground), *cert. denied*, 465 U.S. 1037, 104 S.Ct. 1311, 79 L.Ed.2d 708 (1984).