**UNITED STATES of America**

v.

**Leigha COTHRAN.**

**Crim. No. 89–0481.**

United States District Court, District of Columbia.

Jan. 24, 1990.

Robert Feitel, Asst. U.S. Atty., Washington, D.C., for the U.S.

Howard Bramson, Washington, D.C., for defendant.

## MEMORANDUM

GESELL, District Judge.

This case compels the Court to examine the latest technique in the "war on drugs" as it is waged at the local bus and train stations. The question presented is whether a young traveller passing through D.C., cornered by police on an interstate bus at the Greyhound station, and faced with a request to search her bag has been seized within the meaning of the Fourth Amendment and whether her subsequent denial of ownership of the bag was voluntary. The defendant has moved to suppress evidence and statements obtained from her as the result of this encounter. The motions have been fully briefed and, after an evidentiary hearing, argued.

The sole witness at the hearing for either side was Detective Ronnie Hairston of the Metropolitan Police Department's Drug Interdiction Unit, a unit on which many motions to suppress have focused because of its role in the "war on drugs." *See, e.g., United States v. Maragh,* 894 F.2d 415 (D.C.Cir.1990); *United States v. Winston,* 892 F.2d 112 (D.C.Cir.1989). Officers attached to the unit patrol the local bus and train stations, approach arriving and departing passengers and passengers in transit, question them, and, frequently, ask them to produce identification and tickets and for permission to search pocket books, bags, and clothing. These officers follow a set routine, are generally courteous, and clearly announce their purpose as narcotics officers from the outset of each encounter.

On November 16, 1989, Detective Hairston and other officers were present when a Greyhound bus coming from the north and heading south stopped at the D.C. Greyhound station. There were no reports of criminal activity or suspicious persons on the bus. The officers initially questioned a number of passengers disembarking at Washington. Thereafter, at about 6:50 p.m., Detective. Hairston and two other officers boarded the bus with the intention of questioning each of the approximately 20 passengers still on the bus planning to continue south. The officers showed cards indicating that they were police officers and announced their intention to question the passengers about narcotics.

The officers worked the bus from each end toward the middle, with Detective Hairston starting from the back. Defendant, age 20, was sitting near the back, on the aisle seat next to a man who appeared to be her companion.

Detective Hairston approached the pair politely and identified himself as a police officer interested in drug traffic. He asked if he could speak to the man. The man agreed and indicated that he and the defendant were travelling together. Detective Hairston then asked the defendant if he could speak to her, and she said yes. He asked for identification and for her bus ticket, and she produced them. The ticket indicated that she was travelling from New York to Orangeburg, South Carolina, a city Detective Hairston did not associate with the drug trade. After returning the identification and the ticket, he asked defendant where her baggage was, and she said it was in the baggage compartment under the cabin. (The evidence revealed that defendant did indeed have baggage in the compartment.) She permitted him to search her handbag and the pockets of her coat, which she was holding. She appeared calm and cooperative. Detective Hairston found no contraband.

Detective Hairston then asked whether a blue tote bag on the luggage rack almost directly above the defendant belonged to her. She said no. The man sitting next to the defendant said it was not his. Another officer, Sergeant Brennan, then inquired generally of the passengers if any of them owned the bag. No one claimed it. Sergeant Brennan next asked the bus driver if all passengers travelling past Washington were on the bus, and the driver said yes.

There is no evidence that Detective Hairston or the other officers at any point drew weapons or spoke to the defendant or other passengers in a threatening or intimidating manner during the entire inquiry on the bus.

Sergeant Brennan removed the tote bag from the bus and placed it against the outside wall of the terminal. Defendant, still on the bus, did not protest. Another member of the unit, Officer Curley, walked a drug-sniffing dog toward the bag. The dog alerted, indicating that the bag contained narcotics. Officer Brennan recovered from the bag a loaded .44 caliber handgun, a photo of three persons, one of whom appeared to Officer Hairston to be the defendant, women's clothing, and a sock containing a substance which resembled and field-tested positive for cocaine.

Officer Hairston reboarded the bus with the intention of arresting the defendant. He approached her and asked her to smile, because the woman who appeared to be the defendant in the photograph was smiling. When she smiled, he noted a further resemblance. She equivocated when asked if she was the woman in the photograph.

Detective Hairston took defendant off the bus and, once outside, formally arrested and handcuffed her, read her her *Miranda* rights, and placed her in a cruiser headed for the police station.

Defendant's counsel contends that she was unlawfully seized within the meaning of the Fourth Amendment once the officers took the tote bag from the rack above her seat and asked if it was hers and that the contents of the tote bag must be suppressed. As the following analysis indicates, the fundamental issue is whether defendant's denial of ownership of the bag was voluntary under the circumstances.

■ A seizure occurs where a police officer, by physical force or show of authority, has restrained a citizen's liberty, *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968), that is, where the police conduct, in view of the totality of circumstances, is " 'so intimidating' that [an individual] could reasonably have believed that he was not free to disregard the police presence and go about his business." *Michigan v. Chesternut*, 486 U.S. 567, 576, 108 S.Ct. 1975, 1981, 100 L.Ed.2d 565 (1988). In this Circuit, a test has emerged requiring the Court to decide whether a reasonable person, innocent of

any crime, would have felt free to leave. *Gomez v. Turner*, 672 F.2d 134, 141 (D.C. Cir.1982); *United States v. Lloyd*, 868 F.2d 447, 450 (D.C.Cir.1989).

The Court of Appeals has held that a seizure does not necessarily occur where police question and ask to search the bags of an Amtrak passenger in transit on a train stopped at Union Station. *United States v. Carrasquillo*, 877 F.2d 73 (D.C. Cir.1989) (passenger seated in coach seat); *United States v. Tovolacci*, No. 88–3142, slip op. at 5 —— F.2d ——, —— (D.C.Cir. Jan. 9, 1990) (passenger in roomette); *United States v. Savage*, 889 F.2d 1113 (D.C.Cir.1989) (roomette); *United States v. Brady*, 842 F.2d 1313 (D.C.Cir.1988) (roomette); *but see United States v. Battista*, 876 F.2d 201 (D.C.Cir.1989) (seizure occurred where officer questioned roomette passenger at 6:30 a.m. and apparently failed to return identification).

When compared to a bus passenger, however, the typical passenger on an Amtrak train, with its wide aisles, bathrooms, and dining cars, has far greater mobility and access to numerous exits not blocked by the police. The defendant in this case was sitting in a cramped bus cabin and would have required the permission of each of the officers to squeeze past them in the narrow aisle. *See United States v. Lewis*, 728 F.Supp. 784 (D.D.C.1990).

In fact, defendant, in contrast with an Amtrak passenger, could not hope to avoid the officers' scrutiny without getting off the bus and risking missing its departure, not a viable option for a reasonable person in her situation. Defendant, a resident of Connecticut, was in transit to South Carolina. She had no intention of visiting Washington, nor is there any indication that she knew her way around the Washington area or would have known what to do had she missed the bus departure. This circumstance also contrasts the defendant with a bus passenger intentionally ending his trip in Washington and walking out of the terminal. *See, e.g., United States v. Winston*, 892 F.2d at 117–18 (no seizure occurred when Drug Interdiction Unit

questioned and obtained consent to search bus passenger arriving in Washington).

Moreover, while the typical Amtrak passenger keeps his luggage with him, defendant's luggage was in the luggage compartment, and to retrieve it, she would have required the aid of the bus driver, the person who had permitted the police on the bus. A request to the driver for such help would risk inviting additional police scrutiny.

In this situation, a reasonable, innocent person would not feel free to leave.

Moreover, if the through passengers on the bus that evening suspected what the Court learned at the motions hearing, it would have been clear to them that they were also not free to refuse the police request to search. The evidence disclosed that refusal to cooperate is sometimes treated as an admission of guilt.

Detective Hairston testified that if a passenger refuses to permit a search of his or her bags or claims not to have identification, he "might be suspicious" and, depending on the conversation with the passenger, would notify authorities at the next stop that he suspected the passenger of carrying drugs.

Thus, denying a police officer's request to search could result in further scrutiny and questioning at every stop. Any reasonable person would feel less than free to refuse a police search if aware that refusal to cooperate could lead to repeated harassment. As the hour became late, police in every city down the line could board the bus and wake the uncooperative passenger.

Perhaps an overzealous police questioner, less familiar with Fourth Amendment strictures and concerned by a renegade passenger's repeated refusal to have her bag searched, would detain the passenger while the bus went on its way. Such a seizure, if tested in court, might ultimately be ruled a Fourth Amendment violation, but from the perspective of the innocent person the harm would already have been done. Having permitted the police to check her papers and search her purse and coat, a reasonable innocent person would feel compelled to permit a further search of a tote bag or to deny ownership of the bag; to do otherwise would signal to the suspicious officers that she had something to hide.

■ In these circumstances, where police officers boarded an interstate bus, informed a passenger, in a strange city and with her luggage locked away, that they were searching for drugs, asked for her identification and ticket, requested permission to and then searched her handbag and coat, and then inquired whether a bag in the luggage rack belonged to her—and where refusal to cooperate invited further scrutiny at future stops—an innocent passenger would not genuinely have felt free to leave or to refuse a request to search luggage. The procedure, as described by Detective Hairston, was sufficiently intimidating to render it a seizure.[1]

■ As this seizure was made without any articulable suspicion of wrongdoing, it violated the Fourth Amendment. See Terry v. Ohio, supra.[2] That determination,

1. The "free to leave" test, which evolved from typical encounters between a police officer and a citizen on the street appears open to question when applied to the systematic operations of the drug intervention unit. Many individuals innocent of drug involvement approve of police enforcement efforts and affirmatively wish to cooperate. They usually have no motivation to refuse a search, have no interest in walking away and readily accept a temporary restraint on their freedom. Some may not even be aware that they have a right to refuse cooperation. According to Detective Hairston, some 80 percent of passengers encountered on buses agree to police requests to search. However, the Court of Appeals has rejected the suggestion that stops pursuant to the Drug Interdiction Unit's systematic detection operations should be subjected to a greater level of scrutiny than other stops. See United States v. Winston, 892 F.2d at 116–17.

2. The Terry analysis is the applicable one here, rather than the "reasonableness" test applied to, for example, seizures pursuant to a stationary police roadblock set up to stop all passing cars to check driver's licenses and registrations. See United States v. McFayden, 865 F.2d 1306 (D.C. Cir.1989). Despite Detective Hairston's professed aim of checking every passenger, his testimony revealed that the unit was not stopping all passengers but rather was forced by time constraints to discriminate among them.

however, is not the end of the matter; a search pursuant to an unlawful seizure may nevertheless be upheld if, but only if, the defendant voluntarily consented to such search. *United States v. Battista*, 876 F.2d at 206. Only such an intervening "act of free will" can "purge the primary taint of the unlawful invasion." *Wong Sun v. United States*, 371 U.S. 471, 486, 83 S.Ct. 407, 416–17, 9 L.Ed.2d 441 (1963).

By disavowing ownership of her tote bag the defendant permitted the police to search it. In determining whether this conduct was voluntary, the Court must consider the totality of factors, *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *United States v. Lloyd*, 868 F.2d at 451.

The defendant is 20 years old. There is no indication that she has previously been involved with the law. She had not been informed of rights, she did not feel free to leave, and despite her calm manner in answering questions, Detective Hairston had searched her purse and coat. Considering the totality of circumstances, her consent was not voluntary. Accordingly, the evidence obtained must be suppressed.[3]

In 1990, federal judges cannot ignore the origins of our constitutional liberties. There is serious ground for concern that present police practices in furtherance of the "war on drugs" represent, in modern sophisticated dress, the same type of government behavior that led to this nation's war of independence. As a government publication stated 50 years ago:

The Fourth Amendment guarantees the security of the people in their persons, houses, papers, and effects against unreasonable searches and seizures. Almost up to the hour of the Revolution the American people had suffered from such injuries at the hands of the British government; and they were determined that their own government should not have the power to invade their privacy by

"writs of assistance," as general search-warrants were called. John Adams, speaking of James Otis' heroic protest against that practice, declared, "The child Independence was born on that occasion."

United States Constitution Sesquicentennial Commission, *The Story of the Constitution* 47 (1937).

We must recall that participants at a Boston town meeting in 1772 complained that "our houses and even our bed chambers are exposed to be ransacked, our boxes, chests, and trunks broke open, ravaged and plundered." Rutland, *The Birth of the Bill of Rights 1776–1791* 25 (1955). We must recall that, as protest against intrusions by British officers grew along the Eastern Shore fanned by James Otis and others, the Virginia Declaration of Rights stated the outrage of the people in 1776 as follows:

That general warrants, whereby any officer or messenger may be commanded to search suspected places without evidence of a fact committed, or to seize any person or persons not named, or whose offence is not particularly described and supported by evidence, are grievous and oppressive, and ought not to be granted.

Most fundamentally, we must remember that Article IV of the Federal Bill of Rights, which became the Fourth Amendment to the Constitution, declares:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized.

This is our heritage. There is, to be sure, a drug crisis today, but it is in times

---

**3.** Defendant's alleged statement on the bus denying ownership of the bag was involuntary, came in response to a police question while she was deprived of her freedom of action and prior to recital of her rights, and thus must be suppressed. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). Her alleged statement at the police station that she "shouldn't have done it for him" was the product of the unlawful seizure and her involuntary denial of ownership of the bag and therefore must also be suppressed.

of crisis that hard-won liberties require the most careful protection.

Consider, against this background, the orchestrated search of defendant's personal effects. Seated in an interstate bus as a paid passenger to a southern city, she finds the bus surrounded by police when it comes to the D.C. bus station for its normal stop. Disembarking passengers are questioned by police and confront canine searches. The 20 through passengers remaining on the bus are confronted by three police officers who seek to examine luggage and search personal effects after polite but thorough questioning.

The police question the defendant, check her identification and ticket, search her purse and coat, and then express interest in her tote bag. Her other luggage is locked under the cabin. If she gets off the bus, she has nowhere to go. If she nonetheless attempts to leave she will probably be stopped for further inquiry and confronted by dogs. If she refuses permission to search she may be confronted again by police at the next stop pursuant to police alert. She is without any practical option except to capitulate to police demands. She is, in a word, seized. And she is illegally seized, because all of this occurred without any grounds for suspicion. Her denial of ownership of the bag under these circumstances was involuntary.

Efforts to protect our citizens from drug use and drug violence, however worthy, must not destroy the bases of the struggle for individual freedom that created this country. Despite the understandable public concern about drug trafficking, no responsible federal judge can cooperate with a system so intimidating that it compels compliance with police requests to search— or a system which permits the exercise of a constitutional right to be treated as an admission of guilt.