**UNITED STATES of America, Plaintiff,**

v.

**Harold Evan GRANT, Defendant.**

No. 89–80798.

United States District Court,
E.D. Michigan, S.D.

March 21, 1990.

On Motion to Stay Release
April 4, 1990.

Robert P. Cares, Asst. U.S. Atty., Detroit, Mich., for plaintiff.

Kenneth R. Sasse, Detroit, Mich., for defendant.

## MEMORANDUM AND ORDER [*]

COHN, District Judge.

### I.

This is a criminal case. Defendant Harold Evan Grant (Grant) is charged with possession with intent to distribute one kilogram or more of a mixture containing a detectable amount of phencyclidine (PCP), in violation of 21 U.S.C. § 841(a)(1). Before the Court for decision is Grant's motion to suppress. For the reasons stated below, the motion is GRANTED.

### II.

The procedural history of this case is as follows.

On November 19, 1989, as a consequence of events occurring at Detroit Metropolitan Airport, Grant was arrested under Michigan law for possession of marijuana. He was taken into custody by agents of the United States Border Patrol.

On November 20, 1989, Border Patrol Agent Donald Buechner (Buechner) filed a criminal complaint against Grant charging a violation of 21 U.S.C. 841(a)(1). On November 29, a grand jury indicted Grant on the same charge.

On December 21, 1989, Grant filed a motion to suppress the evidence obtained at the time of his arrest on the ground that the seizures and searches relating to his arrest and to the subsequent search of his baggage in New York City violated his Fourth Amendment rights. The Court referred the motion to suppress to a magistrate who held a suppression hearing on January 18, 1990. After hearing testimony from government witnesses, the magistrate ruled that Grant voluntarily left the aircraft on which he was travelling from Los Angeles to New York and voluntarily consented to a search of his carry-on bag after leaving the plane. However, he concluded that the search of Grant's checked baggage in New York violated his Fourth Amendment rights and recommended that the motion to suppress should be granted because there was no justification for the government agents' failure to obtain a search warrant once they suspected that containers found in Grant's luggage contained PCP.

[*] This Memorandum and Order supersedes and revises the Court's bench ruling of March 9, 1990 granting defendant Harold Evan Grant's motion to suppress.

On January 22, 1990, the magistrate filed a written report and recommendation memorializing his ruling. On February 14, 1990, the Court heard cross-objections to the magistrate's report and recommendation and ruled from the bench that the motion to suppress should be granted *in toto*. On February 16, 1990, at a hearing reviewing a pretrial detention order, the Court took under consideration the government's motion for reconsideration of its February 14 ruling. On March 9, 1990, the Court upheld its prior grant of the motion to suppress. This Memorandum and Order finalizes the Court's decision in the matter.

### III.

The Court finds the following facts based on the suppression hearing testimony of Border Patrol Agent Buechner; Roger La-Grone (LaGrone), a supervisor for Northwest Airlines at LaGuardia Airport in New York City; Albert Sornberger (Sornberger), a detective with the New York Port Authority stationed at LaGuardia Airport; Border Patrol Agent Jeffrey Coudure (Coudure); and Larry Cornish (Cornish), a Deputy Wayne County Sheriff.

■ Border Patrol agents regularly check early morning flights arriving at Detroit Metropolitan Airport from the Southwest for drug traffickers and for illegal aliens, because those flights are not checked in their cities of origin.[1] The agents check both passengers who deplane and those in transit. According to their testimony, the agents regularly question everyone who remains seated on such a flight, regardless of whether or not there is a an articulable reasonable suspicion that the person is an illegal alien.

On November 19, at approximately 6:00 AM, there were two Border Patrol agents (Buechner and Coudure) present at the Detroit Metropolitan Airport to check Northwest Airlines flight 338, a domestic flight that originated in Los Angeles and was scheduled to proceed on from Detroit to New York City. Flight 338 arrived at approximately 6 AM and was scheduled to depart at approximately 7 AM. The arriving passengers deplaned before the Border Patrol agents reached the gate.

When the agents arrived at the gate at approximately 6:30 AM, they boarded the plane and walked through it once without questioning anyone. They then left the plane to question two passengers suspected of being illegal aliens who had already deplaned and were waiting in the gate area. After determining that the two passengers were illegal aliens, the agents reboarded the aircraft to begin the process of questioning all persons who they thought might be aliens. The questioning process went as follows: the agents identified themselves as Border Patrol agents; they asked the passengers where they came from and their destination; and then they asked each passenger to produce immigration documents. The agents described themselves as dressed in Levi's jeans. They gave no reason why they were not in uniform despite the fact that they were conducting an activity traditionally conducted by uniformed Border Patrol agents.

At the beginning of their sweep through the plane, the agents observed Grant asleep at the back of the plane. They decided to begin the sweep by questioning Grant because of his hairstyle, which indicated that he might be of Jamaican origin. According to Buechner, they approached him first "just to be on the safe side." One of the agents tapped Grant on the shoulder and identified himself as a Border Patrol agent. He asked Grant where he was coming from. He responded, "Los Angeles." The agent asked where Grant was born. He responded, "Belize." The agent asked Grant how long he had been in the United States. He responded, "Six years." The agent asked Grant for his immigration doc-

---

**1.** Despite the government's assertions at the suppression hearing, the Court finds no statutory authority for the Border Patrol to be involved in interdicting narcotic substances *inside* the United States, except incident to an illegal alien or any other person carrying them across the border. Because this was an internal domestic flight, originating in Los Angeles with an interim stop in Detroit, it appears that the Border Patrol had no authority to engage in apprehending suspected drug traffickers.

uments, or "green card." He responded that it was in his carry-on bag. He then retrieved his carry-on bag and produced the card. The agent saw nothing suspicious in the card other than that it might be a forgery, because the agent said he occasionally encountered forged green cards. Nothing on the face of the document presented to the agent suggested that it was a forgery.

The agent observed that Grant was shaking as he handed the green card over to him. While the agent was questioning Grant, he stood in the aisle of the aircraft next to him. Another agent stood one row away. A third law enforcement officer, Wayne County Deputy Sheriff Cornish was positioned at the nose of the aircraft.

The agent looked for Grant's name on a passenger manifest for flight 338 obtained from Northwest Airlines and could not find it. The agents sometimes make use of passenger manifests, if they are available. However, there is nothing in the record to suggest that the manifests accurately reflect the names of all the passengers on the aircraft. The agent then asked Grant where he was going. Grant said that he was going to John F. Kennedy Airport in New York, while the aircraft was actually headed to LaGuardia.

■ The agent then asked Grant for his ticket. He said that the ticket was in his checked luggage. This made the agent suspicious. However, the Court takes judicial notice of the fact that a ticket is not necessary to board a Northwest Airlines flight. At check-in, the airline agent removes the ticket from the passenger's ticket package, leaving the passenger with a copy. The airline agent places the original ticket in the passenger's boarding pass. The original is removed from the boarding pass when the passenger boards the plane.[2]

After learning that Grant did not have his ticket, the agent asked Grant to look for it in his carry-on bag. Grant looked in the bag briefly and then stood up and walked forward to a location in the middle of the aircraft on the left side, taking his carry-on bag with him. The agent followed Grant and told him that he still needed to see his ticket. Grant said he would look for it. The agent left to question other passengers.

Working from the front of the aircraft, while the other agent worked from the rear, the two Border Patrol agents proceeded to remove 56 passengers from the flight. They then returned to Grant who again appeared to be asleep. They woke him again. At the inception of this second round of questioning, the agents asked Grant to leave the aircraft. He agreed to do so.

At this point, the aircraft was five to ten minutes away from its scheduled departure from Detroit. As the agent deplaned with Grant, he told the flight attendant that one passenger might or might not return to the aircraft. However, he did not ask that the aircraft be held until a determination was made. Nor did he tell Grant that he had a choice as to whether or not he wanted to deplane.

Grant was taken to an area where all of the other aliens who had been taken off the plane and arrested were sitting. He was placed in a row by himself. The agent then asked if they could go through his carry-on bag. He consented. In the course of that search, the agents discovered a small quantity of marijuana. Grant was then arrested for a state law offense, but he remained in the custody of the Border Patrol. The agent then conducted a full body search incident to the arrest.

During that search, the agent discovered a baggage claim ticket. Grant denied that it was his. The agent then contacted Northwest Airlines at LaGuardia and asked them to retrieve the bag. Grant was taken to the Detroit lock-up of the Border Patrol.[3]

---

**2.** Grant's ticket was a one-way ticket. Therefore, the copy of the ticket was of no use to him other than as a receipt.

**3.** One question that has remained unanswered throughout the proceedings in this case is why

Grant remained in custody of the Border Patrol when he was arrested on a state charge. This strikes the Court as particularly unusual when state law requires that an arrestee on a state charge be taken to a state magistrate immediate-

At that time, Grant admitted that the luggage check belonged to him and said that he initially denied ownership because he was nervous and sleepy. Grant's acknowledgement of ownership occurred between 7:30 and 7:45 AM. The aircraft did not arrive in New York until 8:30 AM.

At LaGuardia, a Northwest supervisor immediately set out to retrieve the luggage. The bag was retrieved and found to be locked. It was placed in an x-ray machine by Northwest service manager LaGrone, who determined that it contained two gasoline-type metal cans. He refused to return the bag without ascertaining the contents of the cans. He contacted the New York Port Authority police who took the bag to United States Customs. Port Authority Police Officer Sornberger had contacted an assistant United States Attorney in Detroit who told him that he needed a search warrant to open the bag. She suggested having the bag sniffed by a drug-detection canine. When the dog did not alert to the presence of drugs, Sornberger had no choice but to return the bag to Northwest. Sornberger testified that, at that time, he had no reason to believe that the bag contained contraband.

Sornberger and a customs agent returned the bag to Northwest, where LaGrone still refused to return it to Detroit until he had determined what was inside it. The bag was then opened by the officers in the presence of LaGrone. LaGrone testified that the bag was opened at his directive. Sornberger confirmed this version of the events; however, he noted that neither he nor the customs agent had mentioned the discussion he had had with the Assistant United States Attorney in Detroit about needing a search warrant before the bag could be opened.

When the cans were removed from the bag, they smelled of lacquer-thinner. Northwest personnel put them in a storage area controlled by Northwest and then returned the bag to Detroit without the cans. LaGrone testified further that if Grant had shown up with the baggage claim ticket,

the cans would have been returned to him. Sometime later, other Port Authority officers returned and smelled the cans again and determined that they contained ether. The cans were then seized for testing because PCP can be contained in an ether base. The Drug Enforcement Agency (DEA) was called to test the substance in the cans. Laboratory testing revealed that the cans contained PCP.

## IV.

### A.

■ Any assessment as to whether police conduct rises to the level of a seizure implicating the Fourth Amendment must take into account all of the circumstances surrounding the incident. *Michigan v. Chesternut*, 486 U.S. 567, 572, 108 S.Ct. 1975, 1978, 100 L.Ed.2d 565 (1988). The test to be applied in deciding what police conduct amounts to a seizure is whether, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. *Id.* at 573, 108 S.Ct. at 1979 (citing *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980)). The test incorporates an objective standard by looking to the reasonable person's interpretation of the conduct in question, enabling police to determine in advance whether the conduct contemplated will implicate the Fourth Amendment. *Chesternut, supra*, 486 U.S. at 574, 108 S.Ct. at 1980.

### B.

■ The Supreme Court's experience has made it clear that what constitutes a restraint on liberty prompting reasonable persons to conclude that they are not free to leave will vary with both the setting in which the conduct occurs and the particular conduct at issue. *See Chesternut, supra* at 573, 108 S.Ct. at 1979 (comparing the facts in *Mendenhall, supra*, with the facts in *INS v. Delgado*, 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984)). As the so-

---

ly. Mich.Comp.Laws Ann. § 764.13 (1989); Mich.Stat.Ann. § 28.871(1) (Callaghan 1985);

*People v. Mallory,* 421 Mich. 229, 365 N.W.2d 673 (1985).

called "war on drugs" intensifies and law enforcement officers seek new means of interrupting the flow of illegal drugs throughout the country, federal courts have been called upon to assess those practices as they are applied to various modes of transportation. Recently, two district courts in the District of Columbia invalidated searches conducted on buses because they resulted from impermissible seizures.

In *United States v. Lewis*, 728 F.Supp. 784 (D.D.C.1990), Judge Stanley Sporkin invalidated a "consensual" body search on the ground that a bus was not an "open and public area." He concluded that, "because of the cramped nature of the interior of a Greyhound bus, ... a reasonable passenger who is suddenly confronted by police officers who board the vehicle, begin to ask questions, and review identification papers would not feel free to walk away." *Id.* Judge Gerhard Gesell reached a similar result in *United States v. Cothran*, 729 F.Supp. 153 (D.D.C.1990). In doing so, he distinguished buses from Amtrak trains, noting that trains have wider aisles, dining cars, and numerous exits that make it more likely that a person confronted by a police officer would feel free to walk away. *Id.*

▇▇ If the police conduct in a particular environment fails the "free to leave" test, the Court must still assess whether the police actions were motivated by reasonable suspicion. As well as finding that the cramped nature of the bus environment lent itself to police coercion, Judge Sporkin and Judge Gesell also determined that the police inquiries involved in their respective cases were not based on reasonable suspicion, invalidating them as investigative stops under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). These findings were crucial to invalidating the searches because, as noted in *United States v. Carrasquillo*, 877 F.2d 73, 77 (D.C.Cir.1989) (upholding a search conducted on an Amtrak train), even if the police presence in a given case is deemed to be too intimidating to be disregarded by a reasonable person, the resulting seizure can be upheld as an investigative stop where the officers act on the basis of an articulable reasonable suspicion.

### V.

#### A.

▇▇ Applying these standards to the facts recited above, the Court finds that, like a passenger seated in the cramped interior of a Greyhound bus, Grant, seated in the cramped rear quarters of an aircraft, confronted by a police officer who boarded the vehicle and began to ask questions and review identification papers, would not feel free to walk away.[4] Indeed, the Court finds that Grant *did* walk away. Yet the Border Patrol agent, without reasonable suspicion, persisted in his inquiry under circumstances where a reasonable person in Grant's position would not have felt that he had any place to go—because he was travelling on to New York—and would have been forced to sit in his seat and answer the agent's questions. Under those circumstances, the Court finds that Grant left the aircraft involuntarily and under police coercion. As a consequence, any subsequent conversation or seizure of evidence from Grant was involuntary and violated his Fourth Amendment rights.

#### B.

▇▇ Likewise, the search of Grant's bag in New York City also violated his Fourth Amendment rights. At the time of the search, the agents in Detroit directing the search were fully aware that the luggage belonged to Grant and that he claimed an ownership interest in it. It is simply fatuous to suggest, as the government does, that the opening of the bag by the officers in New York City was at the direction of

---

**4.** In reaching this decision, the Court reemphasizes the importance of *both* the setting for the encounter and the conduct of the law enforcement personnel involved. As should be clear from the Supreme Court's ruling in *Chesternut*, the mode of transportation in which the investigative stop occurs cannot by itself create a per se justification for a particular stop. *See* 486 U.S. at 573, 108 S.Ct. at 1979. Nor can it alone invalidate the stop.

the supervisor of Northwest Airlines.[5] The officers in New York City had been told that before they could open the bag, it was necessary for them to obtain a search warrant. The government cannot shift the blame for opening the bag to the Northwest supervisor under the circumstances described above. Consequently, anything obtained in the search of the bag must be suppressed.

## C.

The Court has previously made mention of the "war on drugs." A war between two countries must be conducted under the rules set down by the Geneva Convention. Similarly, the Constitution of the United States is the convention governing the "war" involved here. As Judge Gesell noted in *Cothran, supra:*

> Efforts to protect our citizens from drug use and drug violence, however worthy, must not destroy the bases of the struggle for individual freedom that created this country. Despite the understandable concern about drug trafficking, no responsible federal judge can cooperate with a system so intimidating that it compels compliance with police requests to search—or a system which permits the exercise of a constitutional right to be treated as an admission of guilt.**

SO ORDERED.

### ON MOTION TO STAY RELEASE[1]

 Before the Court is the government's motion to stay the release of the defendant from detention. The motion will be granted in part. Defendant shall continue in detention until Wednesday, April 11, 1990, at 2:00 p.m., unless the Court of Appeals stays this order. The reasons follow.

Defendant has been in detention since November 19, 1989, on a charge of possession with intent to distribute one kilogram or more of a mixture containing a detectable amount of phencyclidine. On March 8, 1990, for reasons memorialized in a written memorandum, dated March 21, 1990, the Court granted defendant's motion to suppress as evidence the phencyclidine which forms the basis of the indictment; as well as any evidence derived from the initial contact between law enforcement agents and the defendant, all as having been unconstitutionally obtained. If the suppression order is not reversed, the government has no case.

The Court, following the hearing and decision on the motion, ordered defendant released on a $50,000 unsecured bond provided his mother executed a third-party custody agreement, and set other limiting conditions. The release was stayed twenty days or whenever the mother signed the agreement, whichever is later. The stay was granted to give the government an opportunity to seek review in the Court of Appeals. Today's order extends the stay to April 11, 1990, or whenever the mother signs the agreement, whichever is later.

The Court is satisfied the order of suppression will be affirmed. Should the government seek review of the order, under the circumstances which obtain, it becomes necessary for the Court to balance the harm of defendant's continued incarceration against the time necessary to obtain review of the order. Likewise, the Court must assess the risk of flight, given the length of sentence defendant faces should he be required to go to trial and should he be convicted.

Defendant is a resident alien. He has been in this country several years. He has substantial contacts with his local commu-

---

**5.** In this regard, the government continually engages in pilpulistic reasoning or hair-splitting, *see* H. Kemelman, *Friday The Rabbi Slept Late* 169–70 (1967), attempting to fashion a meaningful distinction between a warrantless search and a warrantless search conducted at the request of a private citizen. The Court is unpersuaded.

** Since it appears that, without the cans, the government has no case, the Court granted a pretrial bond following the hearing on March 9,

1990. However, the Court has fashioned a set of conditions that assure Grant's continued presence in order to give the government an opportunity to review the Court's order before Grant's release takes effect, no earlier than March 29, 1990.

**1.** This is a revision of the Court's bench memorandum of March 29, 1990.

nity, including his mother. If he should flee, he could not reenter the country should the suppression order be affirmed on appeal. Defendant has substantially more to gain than to lose by remaining in the United States. The government is wrong in stating that the risk of flight is as great today as it was November 21, 1989 when defendant was ordered detained.

The Court views the law enforcement agents' conduct in this case as particularly egregious. To require defendant's continued detention while the government pursues an appeal, would only compound the unfairness now present. However, the Court of Appeals may view the case quite differently. Should it do so, the government's interests are protected. There is no great harm in several more days of detention. What is important is to insure appropriate review of the Court's actions in a timely manner and that has been done by the Court's formulation.