UNITED STATES of America, Plaintiff,

v.

Brenda ALSTON, Defendant.

Crim. No. 90–0187.

United States District Court,
District of Columbia.

July 23, 1990.

Richard Tischner, Asst. U.S. Atty., Washington, D.C., for Government.

Warren Gorman, Chevy Chase, Md., for defendant.

MEMORANDUM

JUNE L. GREEN, District Judge.

This matter is before the Court on Defendant Brenda Alston's Motion to Suppress Evidence and Statements. The sole witness at the suppression hearing was Detective Kimberly K. Oxendine, of the Metropolitan Police Department, who testified on behalf of the government. For the reasons stated below, the Court grants defendant Alston's motion to suppress evidence and statements.

I. FACTS

The defendant, Ms. Brenda Alston, was traveling aboard a Greyhound bus from New York City to Richmond, Virginia on March 23, 1990. The bus made a scheduled stop in the Greyhound Bus Station located at 1005 First Street, N.W. in Washington, D.C. During the stop, Detective Kimberly Oxendine and Detective Hairston, of the Metropolitan Police Department, boarded the bus looking for two male passengers suspected of carrying narcotics. The officers located one of the suspects towards the front of the bus. Detective Hairston requested and received permission to interview him. Detective Oxendine testified at the suppression hearing that the suspect also agreed to be searched. While still at the front the bus, Detective Hairston

searched the man but found no illegal substances.

A short while later, the second suspect returned to the bus. Detective Oxendine boarded the bus again, this time with Detective Edward Curley who interviewed the second man with his consent. The officers also conducted a consensual search of the second suspect's suitcase just outside the bus. The suitcase contained Tusinex, an illegal narcotic substance, and was seized by the officers.

Detective Oxendine testified that she first noticed the defendant when she saw Ms. Alston staring out the bus window, while the police officers searched the suitcase. Ms. Alston appeared to show an inordinate amount of interest in the officers' operations. Detective Oxendine approached the defendant when she boarded the bus a third time. She positioned herself in the row of seats directly behind the defendant. Detective Curley also was behind the defendant in a nearby seat. Detective Oxendine identified herself as a police officer and asked Ms. Alston if she could talk with her. The defendant agreed to speak with the detective. Detective Oxendine asked for the defendant's ticket, and the defendant produced a ticket reflecting travel from New York to Richmond, Virginia. The defendant explained that she was traveling to Richmond to visit her boyfriend, who was a married man, and that she was returning immediately to New York so she carried no luggage. Oxendine then explained the interviews were conducted in attempt to stem the flow of drugs into Washington, D.C. She asked the defendant if she was carrying any illegal narcotics. Ms. Alston responded that she was not. The detective then asked and received permission to search the person and handbag of Ms. Alston. As the defendant handed her purse to the detective, Detective Oxendine said she noticed the defendant's hands shaking. Inside the purse the detective found a sock which concealed 81 vials and 159 wax bags containing cocaine, and a plastic bag filled with heroin. The defendant was placed under arrest.

The defendant argues that the police officers violated her fourth amendment rights when they questioned her and searched her handbag. She claims that the police lacked probable cause or any articulable suspicion of wrong-doing, and therefore, she was seized illegally.

The government counters that Ms. Alston's rights were not violated because she agreed voluntarily to speak with and have her handbag searched by the officers. The government maintains that the fourth amendment is not implicated by a voluntary encounter between law enforcement officers and a citizen. The government further argues that the defendant's consent to the search of her handbag vitiates her claim of a fourth amendment violation.

## II.  DISCUSSION

The Fourth Amendment of the United States Constitution protects "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures ...". The search or seizure of a person without a warrant is per se unreasonable unless it falls within certain narrowly defined exceptions to the warrant requirement. Absent a warrant, the government carries the burden of justifying an unreasonable search or seizure. *Rouse v. United States*, 359 F.2d 1014 (D.C.Cir 1966).

The first question this Court must address is whether or not under the fourth amendment the defendant was "seized" when she was approached aboard the Greyhound bus by Metropolitan Police Department Officers. Not all police-citizen encounters result in the seizure of the citizen. *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968). The Supreme Court has held that "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual ... in [a] public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions." *Florida v. Royer*, 460 U.S. 491, 103 S.Ct.

1319, 75 L.Ed.2d 229 (1983). Thus, even absent any probable cause or articulable suspicion of wrongdoing, a police officer may engage a citizen in voluntary conversation without violating the fourth amendment. *United States v. Tavolacci*, 895 F.2d 1423 (D.C.Cir.1990); *United States v. Winston*, 892 F.2d 112 (D.C.Cir.1989); *United States v. Baskin*, 886 F.2d 383 (D.C.Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1831, 108 L.Ed.2d 960 (1990).

Whether or not a particular defendant was seized depends on the totality of the circumstances. *Baskin*, 886 F.2d at 386. If, in view of all the circumstances, a reasonable person would not feel free to leave, then a "seizure" has taken place under the fourth amendment. *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). In this Circuit, a reasonable person is one who is innocent of any crime. *Gomez v. Turner*, 672 F.2d 134, 140 (D.C.Cir.1982).

Considering all the circumstances surrounding Ms. Alston's arrest, the Court concludes that the defendant was seized when officers interviewed her and searched her handbag on board the Greyhound bus. As the plaintiff points out, other Judges of this Court have held such bus interviews tantamount to a seizure of the interviewee. *United States v. Lewis*, 728 F.Supp. 784 (D.D.C.1990) (J. Sporkin); *United States v. Cothran*, 729 F.Supp. 153 (D.D.C.1990) (J. Gesell); *United States v. Felder*, 732 F.Supp. 204 (D.D.C.1990) (J. Sporkin); *United States v. Fields*, 733 F.Supp. 4 (D.D.C.1990) (J. Penn). Factors which led these courts to conclude that the defendant had been seized included: "the cramped nature of the interior of a Greyhound bus and the narrow width of the exit aisle ...", which limit a passenger's mobility; the presence of several law enforcement officers, at least one of whom blocks the bus' only exit; the fact that a passenger who leaves the bus to avoid further questioning risks missing its departure; and the fact that in some cases, a passenger's luggage must be retrieved from the locked undercarriage of the bus before she can depart. *See Lewis*, 728 F.Supp. at 787; *Cothran*, 729 F.Supp. at 155–156; *Fields*, 733 F.Supp. at 7.

In viewing the evidence, this Court fails to find any meaningful distinctions between the facts of this case and those presented to other Judges of this Court who determined an illegal seizure had occurred. As in those cases, the defendant was confronted by law enforcement officers while she sat on board a Greyhound bus during a scheduled stop in the District of Columbia. Like the other defendants, Ms. Alston was traveling on to her final destination and did not intend, or presumably desire, to interrupt her trip by disembarking in Washington, D.C. On board, the defendant's mobility was limited both by the "cramped" quarters of the bus, and the intimidating presence of the officers.

In addition to these facts, the defendant in this case observed two of her fellow passengers interviewed and searched by the same officers prior to being approached. She had no way of knowing that the interviews and searches were consensual in nature.[1] The circumstances of these encounters lend credence to the defendant's claim that she felt compelled to respond to Detective Oxendine's requests.

The Court recognizes that the officers on board the bus placed themselves carefully behind the defendant's seat while she was being interviewed.[2] Thus, the defendant

---

1. Detective Oxendine testified that the interviews of both male suspects were conducted in conversational tones so that others around were unlikely to overhear them. The detective testified that although she was standing only a few feet away from the first male suspect when he was interviewed, she could not hear the conversation. Thus, the Court assumes that the defendant, who was seated towards the middle of the bus many seats away from the front and rear of the bus where these interviews occurred, could

not have heard either man consent to be searched.

2. The defendant states in her Motion to Suppress Evidence and Statements that Detective Oxendine, in fact, placed herself in the aisle immediately in front of the defendant's seat, blocking the defendant's exit. However, the defendant failed to take the stand and testify to her version of the facts at the suppression hearing. Therefore, the Court cannot credit the de-

cannot claim that she would have had to force her way past one or more police officers to exit the bus. Nonetheless, the Court finds that a reasonable person would not have felt free to leave the officers' presence. In such a contained area, the officers were only steps away from being able to prevent the defendant's departure. A passenger who may be seized from behind before reaching the bus' only exit is likely to feel equally as trapped as one whose path to the exit is blocked. In any case, the defendant's egress from the bus was blocked, in essence, by the presence of two other officers immediately outside the bus' door.

Because the Court finds the factual circumstances of Ms. Alston's arrest are substantially similar to other bus interview cases decided by this District Court, and because the Court is persuaded by the reasoning set forth in the aforementioned cases, it concludes that the defendant was seized. The Court further concludes that as the seizure was made without any articulable suspicion of wrongdoing it violated the defendant's fourth amendment rights.

Three final points as to the issue of seizure need to be addressed. First, the Court wants to make clear that it is not establishing a per se rule that any police-citizen encounter which takes place on a bus must be a seizure. As this Court's opinion in *United States v. Wright*, Crim. No. 90–0060 (D.D.C. April 2, 1990), illustrates, there may be some factual circumstances where it is obvious that a defendant interviewed on a bus does not feel compelled to remain in the officer's presence. However, in most bus interview cases, the location of a defendant is a persuasive factor in determining that he or she has been seized.

Second, the Court rejects the argument that the Court of Appeals decisions regarding police-citizen encounters on trains re-

quire the Court to find that the bus interview was not a seizure.[3] *See United States v. Carrasquillo*, 877 F.2d 73 (D.C. Cir.1989) (passenger seated in train car not seized when officer stood nearby and asked to see his ticket and identification); *United States v. Tavolacci*, 895 F.2d 1423 (D.C.Cir. 1990) (passenger in train roomette not seized by officers who came to his door and asked to see his ticket and identification); *United States v. Savage*, 889 F.2d 1113 (D.C.Cir.1989) (same); *United States v. Brady*, 842 F.2d 1313 (D.C.Cir.1988) (same); *but see United States v. Battista*, 876 F.2d 201 (D.C.Cir.1989) (passenger in roomette was seized when officers questioned him at 6:30 a.m. and failed to return his identification). As both Judges Gesell and Penn have pointed out, an analogy between a bus and a train is not helpful in this context. "When compared to a bus passenger ... the typical passenger on an Amtrak train, with its wide aisles, bathrooms, and dining cars, has far greater mobility and access to numerous exits not blocked by the police." *Cothran*, 729 F.Supp. at 155. Moreover, the bus passenger cannot simply close the door on an inquiring officer as can a passenger in a train roomette. *See United States v. Tavolacci*, 895 F.2d 1423, 1425 (D.C.Cir.1990); *and United States v. Savage*, 889 F.2d 1113, 1117 (D.C.Cir.1989). Nor can she walk to another cabin or car of the bus to avoid the officer's questions. In order to avoid an unwanted intrusion by the officers, the bus passenger must get off the bus and risk missing its departure. *Cothran*, 729 F.Supp. at 155; *Fields*, 733 F.Supp. at 7.

Third, the Court bases its conclusion that the defendant, Brenda Alston, was seized during the interview aboard the Greyhound bus on the factual similarity to and the persuasive reasoning of *Lewis*, *Cothran* and *Fields*. An appeal is pending in each of these cases. If the Court of Appeals

fendant's statement which contradicts Detective Oxendine's direct testimony.

**3.** The government draws an analogy between the train interviews and the bus interviews in its Memorandum of Points and Authorities In Support of Motion to Suppress Tangible Evidence

and Statements, which the government filed on May 4, 1990 in the case of *United States v. Josephine Cherry Mark*, 742 F.Supp. 17 (D.D.C. 1990). The Court has issued an Order and Memorandum granting Mark's motion to suppress in conjunction with the present Order and Memorandum.

should determine that these cases were wrongly decided, this Court, of course, would have to reconsider its ruling in this case.

■ An illegal seizure or detention of a defendant taints any consent to search given by the defendant after the seizure. Only "an intervening independent act of free will" ... "purge[s] the primary taint of the unlawful invasion." *Wong Sun v. United States*, 371 U.S. 471, 486, 83 S.Ct. 407, 416–17, 9 L.Ed.2d 441 (1963). The Courts find no such act present in this case. The defendant's consent to allow Detective Oxendine to search her handbag followed immediately on the heels of the illegal seizure. Moreover, in view of the circumstances, the defendant's consent was not voluntary. After watching her fellow passengers detained and searched by a number of law enforcement officers, the defendant was confronted by two of the officers. One officer asked to see her ticket, questioned her about her travel plans and asked to search through her handbag. The defendant, who was not intending to stay in Washington, may have agreed to the search in order to avoid being forced from the bus. Considering the totality of factors, the Court concludes that the defendant's consent was not voluntary, and the taint from the unconstitutional seizure remains. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

### III. CONCLUSION

Because the Court finds that the defendant was seized in violation of the fourth amendment and her consent to search her handbag was given involuntarily, it must suppress all evidence and statements which were the product of the unconstitutional search and seizure. For the above stated reasons, the Court grants the defendant's motion to suppress.