**UNITED STATES of America, Plaintiff,**

v.

**Brenda ALSTON, Defendant.**

**Crim. No. 90–0187.**

United States District Court,
District of Columbia.

Feb. 5, 1992.

Maurice A. Ross, Asst. U.S. Atty., Washington, D.C., for plaintiff.

Warren Gorman, Chevy Chase, Md., for defendant.

## MEMORANDUM

JUNE L. GREEN, District Judge.

The Court of Appeals remanded this action, 946 F.2d 1567, for proceedings consist-ent with *Florida v. Bostick*, —— U.S. ——, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) and *U.S. v. Lewis*, 921 F.2d 1294 (D.D.Cir.1990). This Court held a *de novo* hearing on the defendant's motion to suppress evidence and statements on February 3, 1992. At the hearing, the Court heard testimony from Detectives K. Oxendine and R. Hairston, of the Metropolitan Police Department, on behalf of the government, and from the defendant. The Court again granted the defendant's motion. This Memorandum and Order memorialize the Court's ruling and explain further the Court's reasoning. The facts are set forth fully in the Court's July 23, 1990 Memorandum. 742 F.Supp. 13.

The issue before the Court is plain: whether the defendant, Brenda Alston, consented voluntarily to the search of her property. The Court finds she did not.

At the hearing, the defendant testified that after witnessing Officer Oxendine and other male officers interview and search several other bus passengers, she, herself, was confronted by Detective Oxendine. She testified that Detective Oxendine placed herself between the defendant's seat and the aisle, blocking the defendant's exit into the aisle. She testified that before identifying herself as a police officer, Detective Oxendine requested some identification from her and asked several questions about her travel plans. According to the defendant's testimony, Detective Oxendine then asked if she could search her handbag. The defendant stated that she felt compelled to allow the officer to search her bag. She testified that she was "pretty sure" that Detective Oxendine was a police officer and she had been raised never to say "no" to an officer of the law. Ms. Alston further testified that she thought she might have to go to jail if she didn't allow the officer to search her handbag [1].

---

1. Ms. Alston also testified that when Detective Oxendine found no illegal contraband in her handbag, the detective handed the bag back to her. She stated that Detective Oxendine then requested permission to search her jacket and that she consented. Ms. Alston maintained that the narcotics recovered by Detective Oxendine came from inside the jacket, not the handbag.

The Court finds that this dispute in the facts is immaterial to its ruling, except as it relates to the witnesses' credibility. Whether the drugs were recovered from the defendant's purse or her jacket is irrelevant to whether the defen-

Given Ms. Alston's testimony, which the Court found thoroughly credible, and the coercive nature of the interview, the Court concludes that Ms. Alston's consent to the search was not voluntary.

The defendant, it appears to the Court, is a rather unsophisticated lady who has spent most of her life working as a domestic in a small, country hamlet in South Carolina[2]. Although she testified that she knows of her rights as a citizen, she also testified her "momma" had raised her that she must always answer "yes" and cooperate with a police officer. According to Detective Oxendine's own testimony, at no time was Ms. Alston ever informed that she had a right not to answer the detective's questions. Thus, the Court is convinced that the defendant believed she had no option other than consenting to the interview and search, and was not informed of another option.

While these factors are very influential in the Court's ruling, they are not determinative under the law. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973) ("While the state of the accused's mind, and the failure of the police to advise the accused of his rights, [are] certainly factors to be evaluated in assessing the 'voluntariness' of an accused's responses, they [are] not in and of themselves determinative."). But the Court finds that these factors when combined with the coercive nature of the circumstances surrounding the interview and search, lead to the conclusion that the defendant's consent was involuntary.

Both detectives and the defendant testified that at least two passengers were interviewed and searched by the officers prior to the interview with the defendant. All three witnesses testified that the luggage of one passenger was searched at the front of the bus, and then removed for additional search, while the defendant was watching. The defendant had no reason to know the interviews or searches were consensual as they were conducted out of her earshot.

To conduct the "consensual" interview of the defendant, Detective Oxendine placed herself in front of Ms. Alston's seat, blocking her only exit. Detective Hairston[3] placed himself a hand's-grab away in the opposite aisle seat.

This chain of events might have left little impression on another individual, well-versed in his or her rights. But for the defendant, already predisposed by upbringing and lack of sophistication to submit to a show of authority, these circumstances overpowered her will to resist.

The Supreme Court declared in *Schneckloth*, "in examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents." *Id.* at 229, 93 S.Ct. at 2048. The police officers' tactics of interviewing and searching a number of the bus's occupants in plain view of fellow passengers and of hemming a passenger in her seat during the course of a "consensual" interview, were, at the very least, subtly coercive. The Court is convinced that for Ms. Alston, given her state of mind, this coercion forced a consent which would not have been given otherwise.

Which brings this Court to its last point. The Metropolitan Police Department must recognize the intimidating nature of its methods: boarding buses in small groups,

---

dant's consent to search her property was voluntary.

**2.** At an earlier hearing to determine the defendant's pretrial release status, this Court put several questions to the defendant about how she could be located if summoned by the Court. Ms. Alston's response, describing the country ways of living, left the Court with a distinct impression that the defendant had little knowledge of the world, and was caught up in something beyond her comprehension.

**3.** In its July 23, 1990 Memorandum, the Court indicated that Detective Curley was seated nearby during the interview of Ms. Alston. However, at the February 3, 1992 motions hearing, Detective Hairston testified that he positioned himself directly across the aisle from Detective Oxendine and Ms. Alston during the interview and search. Detective Curley remained outside the bus to search the suitcase which was seized from another passenger.

spreading out in cramped confines and attempting to interview and search a significant number of the passengers on board. For some passengers, like Ms. Alston, these coercive tactics may overwhelm a particularly vulnerable state of mind. The voluntariness of an individual defendant's consent in these circumstances will continue to be a difficult issue. A simple and unremarkable statement to the defendant that she has the right to refuse, prior to eliciting the defendant's consent would go a long way toward eliminating the issue of voluntariness of consent from future motions to suppress. While the Court recognizes that the law does not require police officers to issue such a warning, common sense dictates that a knowing consent is a voluntary one. *See Schneckloth*, 412 U.S. at 231, 93 S.Ct. at 2049.

## ORDER

Upon consideration of the defendant, Brenda Alston's, Motion To Suppress Evidence And Statement; the government's Opposition to the motion; testimony presented at the February 3, 1992 hearing on the motion; the entire record; and for the reasons set forth in the accompanying memorandum, it is by the Court this Fifth day of February 1992,

ORDERED that the defendant's motion to suppress is granted.